### CONTRA COSTA WATER CO. v. CITY OF OAKLAND et al.

(Circuit Court, N. D. California. June 29, 1904.)

**1. JUDGMENT (§ 663*)—JUDGMENTS OPERATIVE AS BAR—EFFECT OF APPEAL.**

Under the rule of decision in California binding on the federal courts, the perfecting of an appeal from a judgment suspends such judgment for all purposes, and deprives it of its effect as an estoppel.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1174; Dec. Dig. § 663.*]

**2. JUDGMENT (§ 828*) — FOREIGN JUDGMENTS — EFFECT OF JUDGMENT OF STATE COURT IN FEDERAL COURT.**

On an application for a preliminary injunction a judgment between the parties rendered by a state court, although not an estoppel, may properly be given consideration as to pertinent matters which were therein determined.

[Ed. Note.—For other cases, see Judgment, Dec. Dig. § 828.*

Conclusiveness as between federal and state courts, see notes to 21 C. C. A. 478; 49 C. C. A. 468.]

**3. WATERS AND WATER COURSES (§ 203*) — WATER COMPANIES — ORDINANCES FIXING RATES—REASONABLENESS OF RATES.**

A water company is entitled to receive from rates collected an income which will enable it to pay its actual operating expenses, interest on its bonded or other indebtedness so far as that indebtedness represents money properly expended in or upon its property, and to pay a reasonable dividend on its capital stock so far as the stock represents money actually received and so invested, and in addition thereto a sum sufficient to cover the annual depreciation of its plant.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 203.*]

**4. INJUNCTION (§ 137*)—PRELIMINARY INJUNCTION—QUESTIONS CONSIDERED ON APPLICATION.**

It is a settled rule for the guidance of the discretion of courts on applications for preliminary injunctions to look to the balance of injury and inconvenience, and to consider whether a greater injury will be done by granting than by refusing an injunction.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 307; Dec. Dig. § 137.*]

**5. WATERS AND WATER COURSES (§ 203*)—INJUNCTION—REGULATION OF RATES.**

A water company supplying water to the city of Oakland, Cal., *held* entitled to a preliminary injunction to restrain the enforcement of a resolution of the city council fixing water rates, on giving a bond to protect consumers, it appearing from the showing made that it could not under such rates earn a net income equal to 5 per cent. on the value of its property employed in the service.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 203.*]

In Equity. On motion for preliminary injunction.

Francis J. Heney, Garret W. McEnerney, and John Garber, for complainant.

J. E. McElroy, R. M. Fitzgerald, and Wm. R. Davis, for defendants.

GILBERT, Circuit Judge. This is an application for an injunction pendente lite made by the Contra Costa Water Company, a corporation of the state of California formed for the purpose of furnishing water to the city of Oakland and adjacent cities.

The bill alleges in substance that the complainant for many years past has been and is now supplying nearly all the fresh water consumed by the city of Oakland and its inhabitants. That, in order to carry out the purposes of its incorporation, the complainant has acquired reservoir sites, buildings, and reservoirs, obtained riparian and other rights and properties necessary to secure the ownership of water caught and impounded in its reservoirs, and has purchased water rights and large tracts of land for the purpose of obtaining an adequate supply of pure, fresh water and preserving the same, as well as other properties necessary and essential in the conduct of its business, the value of all of said properties being in excess of $8,500,000. That said properties consist of the following: (1) Lake Chabot, having a storage capacity of 5,070,000,000 gallons, a yielding capacity of 8,000,000 gallons per day, and a large drainage area, of which the complainant owns 5,550 acres, said lake being constructed by means of an earthen dam 127 feet high above the bed of the original stream; (2) a system of artesian wells near Alvarado, located on a tract of 377.54 acres, having a yielding capacity under natural flow of 5,000,000 gallons per day; (3) Lake Temescal, having a storage capacity of 250,000,000 gallons and a yielding capacity of 340,000 gallons per day, said reservoir being created by the construction of an earthen dam over 100 feet in height; (4) water rights on Sausal creek, enabling the complainant to utilize water to the extent of 400,000 gallons per day; (5) a system of tunnels in the Piedmont Hills, yielding 117,000 gallons of water per day. That, in connection with said sources of supply, the company owns and operates a distributing plant, consisting of 430 miles of pipe line, 4,000 meters, all necessary stop gates, fixtures, devices, etc., and has within the city of Oakland 16,000 services and 515 hydrants, also 11 storage and distributing reservoirs in addition to the lakes, having a joint storage capacity of 18,000,000 gallons, two mechanical filtrating and straining plants, one each at Lake Chabot and Temescal, four complete pumping plants with an average capacity of 18,000,000 gallons per day, large quantities of material, and supplies of all descriptions, a complete equipment of tools and appliances. That, in addition to these, the complainant owns various described tracts of real estate within the city of Oakland and elsewhere, as well as an established business and all requisite franchise for the conduct of its business of collecting and dispensing water, its said franchise being assessed at the present time at the value of $1,000,000. That during the year ending June 30, 1905, the operating expenses of the complainant actually and necessarily incurred in operating its works for the purpose of carrying water to the city of Oakland and its inhabitants will amount to the sum

of at least $113,005. That during said year the complainant will be compelled to pay at least the sum of $128,887 taxes levied upon its property for that year. That, in addition to supplying said city of Oakland and its inhabitants, the complainant now supplies water to the towns of San Leandro and Emeryville and the inhabitants thereof, and to the inhabitants of a portion of the city of Berkeley, and also supplies water for certain purposes to the county of Alameda. That the total revenue which the complainant will derive from these sources will not exceed the sum of $401,800. That in order to derive a just income from the water supplied to the city of Oakland and its inhabitants to pay for necessary additions to its plant, its operating expenses, and taxes upon its property, and to pay 7 per cent. upon the present value of its plant, it is entitled to have the rates for the water so furnished so fixed that the gross income therefrom will amount to $850,-000. That in addition thereto the complainant is entitled to an annual sum for depreciation of its plant, amounting to at least $82,000. That in January, 1904, the complainant furnished the council of the city of Oakland, in compliance with the law, a detailed statement showing the name of each water rate payer, his or her place of residence, the amount paid for water by each, during the year preceding, also showing all revenues derived from all sources during the said year, and an itemized statement of its expenditures for supplying water during said time. That from said statement it appeared, and such is the fact, that the receipts and expenditures so made by complainant during said time were as follows: Receipts from water rates, $546,181; from other sources, $27,401—making a total of $573,582. That on May 31, 1904, the council of the city of Oakland passed a resolution purporting to fix a maximum rate to be charged by the complainant for furnishing water to the city and its inhabitants for the fiscal year beginning July 1, 1904. That the said rates were fixed arbitrarily and without any consideration or regard to the right of the complainant to a reasonable compensation or to a reasonable income or any income upon its investments, and without consideration of the value of complainant's works or property or its operating expenses or its taxes, or the right of its stockholders to reasonable dividends upon the stock. That in the passage of such resolution the said council, through a majority of its members, declared that no consideration had been given to a large and important and material part of the property and plant of the complainant, used and necessary to be used for the purpose of supplying the city of Oakland and its inhabitants with fresh water, and no consideration whatever was given to the expense of operating the same or the taxes required to be paid thereon. That a fair return and rate of interest upon the present value of the complainant's property, which exceeds the sum of $8,500,000 for water to be supplied to the city of Oakland and its inhabitants for the fiscal year beginning July 1st, and a just and reasonable rate therefor is 7 per cent. of said sum of $8,500,000 over and above operating expenses and taxes, and over and above and in addition to at least 2 per cent. upon the value of that portion of said property which falls within the definition of perishable structures, to wit, $4,500,000. That according to the complainant's

best information and belief the taxes which will be levied upon its property so used by it in supplying said city of Oakland and its inhabitants with water will exceed the sum of $128,086.96, which is the amount of state, city, and county taxes which were levied upon said property for the year 1903. That the rates purporting to be fixed by said resolution are unjust, unreasonable and unconstitutional, oppressive and confiscatory. That if said resolution is enforced the complainant's gross income for the fiscal year beginning July 1, 1904, after deducting the operating expenses and taxes, will be wholly inadequate to pay a reasonable income or interest upon the actual present value of the property of the complainant in actual use in supplying water to said city and its inhabitants, or any greater income or interest thereon than about the rate of 2½ per cent. per annum. That no allowance or value was ever made by said council for the franchise of complainant, although the same is assessed by said city of Oakland at the value of $1,000,000, and taxes are collected by said city from the complainant on that value. That said council has refused to value the established and going business of the complainant at any sum, although such value exceeds the sum of $1,000,000. That the fair and reasonable value of the service to be rendered by the complainant to the city of Oakland and its inhabitants in supplying them water during the year beginning July 1, 1904, is $595,000, exclusive of taxes, operating expenses, and a proper allowance for depreciation of the complainant's plant, resulting from its use. That the complainant is ready and able to supply to said city and its inhabitants at the present time 15,000,000 gallons per day of pure fresh water, but that the quantity of water which is necessary to meet the reasonable requirements of said city and its inhabitants at the present time does not exceed an average of 10,000,000 gallons per day.

The bill further alleges that on May 28, 1901, a judgment was rendered in the superior court for the county of Alameda, state of California, in a suit brought by the complainant against the city of Oakland, the council thereof and its members, to set aside an ordinance passed by said council on March 26, 1900, establishing water rates for the year beginning July 1, 1900, which judgment was rendered in favor of the plaintiff therein and against all the defendants. That said court was occupied for a period of seven months in taking testimony upon the issues involved in said suit, and in the judgment it was found, adjudged, and decreed, among other things, that at the date of the commencement of that suit in May, 1900, the value of the property of the complainant, used and necessary to supply the city of Oakland and its inhabitants with water, was then of the value of $7,000,000. That in said judgment it was further determined, and so stipulated and agreed by and between the parties thereto, that at least seven-eighths of the operating expenses of said complainant were incurred in operating its works and carrying on its business of furnishing water to the city of Oakland and its inhabitants, and that its total revenue during the year ending June 30, 1901, from its consumers of water, other than said city of Oakland and its inhabitants, would not exceed the sum of $51,750. That by its said judgment said superior

court further found and adjudged that a fair return and rate of interest upon the value of the complainant's property was 7 per cent. of $7,000,000 over and above the operating expenses and taxes mentioned in said decree, and that the complainant was entitled to receive for the water to be supplied by it to the city of Oakland and its inhabitants during the year beginning July 1, 1900, at least 7 per cent. upon $7,000,000 over and above its operating and other expenses, including the maintenance of its plant and the taxes upon its property, less the income derived by it from the other sources therein mentioned, and found as aforesaid to be the sum of $51,750. That after the rendition of said decree, to wit, on June 28, 1901, the council of said city of Oakland adopted rates for the year commencing July 1, 1901, which were estimated at that time to yield a gross revenue of $540,000, which was less by $112,000 than the amount to which the complainant was entitled to receive under the terms and provisions of said judgment and decree. That the complainant offered to accept said rates with the understanding that, in consideration thereof, said rates should remain undisturbed until such time as the growth of the said city of Oakland would increase its revenues to such sum as it would be entitled to receive under said judgment and decree. That said rates were again adopted by ordinance and resolution passed by the council of said city of Oakland in fixing rates for the year commencing July 1, 1902, and were again adopted in fixing the rates for the year commencing July 1, 1903. That said rates so fixed never have yielded revenues equal to the amount to which the complainant was entitled under the provisions and terms of said judgment and decree.

The bill further alleges that the capital stock of the complainant is 57,026 shares, of the par value of $100 each. That from July 1, 1899, to December 1, 1902, the market value of said shares ranged from $72.25 to $70, and that the highest price at which it sold during said period was $83 and the lowest was $63, and that the average price was about $75 per share.

The bill alleges that during the year 1903 certain politicians commenced an agitation among the inhabitants of the city of Oakland in favor of municipal ownership of waterworks, and misrepresented to the citizens thereof the true and actual value of the complainant's property, and the present mayor and the members of the council of said city did pledge themselves before election to the voters of said city to reduce the rates chargeable by the complainant for its water for the fiscal year commencing July 1, 1904, all of which was done to the end that said city of Oakland might purchase and acquire the complainant's property at a price far below its real and true value. That, by reason of said threats and said actions of the defendants, the market value of the complainant's capital stock did, in the month of April, 1904, decrease and fall to the sum of $35 per share, and that the highest price at which such stock has been sold during the months of April and May, 1904, is $37.75 per share, and that the highest price at which it has sold in the market since the election of the present council of the city of Oakland is $40 per share. That the population

of the city of Oakland, which in 1900 was 66,960, has increased; that in the year 1903 it was about 84,000; that at the present time it is between 85,000 and 90,000; that during the year 1900 the number of services by said complainant of water in said city of Oakland increased 423; in the year 1901, 590, in the year 1902, 629, and in the year 1903, 1,004.

The answer of the city of Oakland denies that the value of the complainant's properties is more than $4,000,000, and denies that its operating expenses in furnishing the city of Oakland and its inhabitants with water will be more than $110,000. It denies that the taxes will be more than $50,795.32. It alleges on information and belief that from all sources the complainant can derive an income of at least $790,897.93, as appears from its sworn statement filed with the city council of Oakland. It denies that the complainant is entitled to an income upon its property greater than 3 per cent. upon the present value thereof, and denies that it is entitled to a gross income for water supplied to Oakland and its inhabitants during the year beginning July 1, 1904, of more than $400,000. It alleges that said council, in fixing the rates to be paid complainant for the year beginning July 1, 1904, so fixed the same that the complainant would derive 6 per cent. net upon the sum of $4,700,000, which was far more than the actual value of the property used by the complainant in supplying the city of Oakland and its inhabitants. It denies that the rates fixed by the resolution of May 31, 1904, were fixed arbitrarily or without due regard to the right of the complainant to a reasonable compensation. It alleges that such rates were fixed with full consideration and regard for the value of the complainant's works and property, its operating expenses and its taxes, and the right of its stockholders to reasonable dividends upon their stock, and with full reference to and consideration of the actual costs of supplying said water. It alleges that the judgment rendered in the superior court of Alameda county has no force or effect, for the reason that the defendants therein duly appealed therefrom to the Supreme Court of the state of California, and said appeal is now pending and undetermined. It denies that a reasonable rate of interest upon the value of the complainant's property used in supplying water to the city of Oakland and its inhabitants during the year beginning July 1, 1904, is 7 per cent., or any more than 4 per cent., over and above operating expenses and taxes. It alleges that the rate fixed by the resolution of May 31, 1904, allows more than a reasonable rate of interest to the complainant on the value of its property used in supplying said city and its inhabitants with water, and that it allows the rate of 6 per cent. above all expenses, taxes, and repairs. It denies that the complainant is entitled to receive for water which will be supplied to the city of Oakland and its inhabitants during the year commencing July 1, 1904, $850,000, or any sum in excess of $418,229.42. It denies that since May, 1900, the depreciation from wear and use on property of the complainant does not exceed 1 per cent. of their aggregate value, and alleges that there has been a large depreciation in value, especially in the distributive system, on account of decay of pipes and other structures; that

since May, 1900, the complainant has not kept its plant in good condition and repair, and has allowed it to deteriorate, and such deterioation amounts to more than 10 per cent. of the value of said property. It admits that in fixing the valuation of the complainant's property the council did not take into consideration as an element of value the "going business" of complainant, and alleges that the actual cash value of all the complainant's property used in supplying the city of Oakland does not exceed $3,500,000, but that the said council in estimating the value thereof, for rate fixing purposes for the year beginning July 1, 1904, fixed the same at $4,700,000 so as to cover all possible contingencies and do ample justice to the complainant. It denies that the fair and reasonable value of the services of the complainant to be rendered to the city of Oakland and its inhabitants during the year beginning July 1, 1904, will be $595,000, exclusive of taxes, operating, expenses, and proper allowance for the depreciation of the plant from natural causes, and alleges that the fair value thereof will not exceed $282,000, exclusive of taxes, operating expenses, etc. It denies that the complainant has the capacity during the average year to supply the city of Oakland and its inhabitants with more than 10,000,000 gallons per day, and alleges that its supply is insufficient for the present needs of the city during seasons of drought. It denies that the allegations of the bill in regard to the political agitation therein averred are true, and denies that the present mayor or the members of the council, or any of them, pledged themselves before election, or at all, to reduce the rates chargeable for complainant's water, but alleges that the resolution was adopted after full and fair consideration, and solely for the purpose of establishing a fair and just rate to be paid to the complainant for supplying water to the city of Oakland and its inhabitants.

The complainant introduced the affidavit of Arthur L. Adams, a civil engineer of experience, who stated that he had carefully examined the properties of the complainant; that Lake Chabot had a storage capacity of 5,500,000,000 gallons, yielding 8,000,000 gallons daily; that the total value of the complainant's properties was $7,034,564, in which he included $500,000 for going business; that its franchise was worth $1,000,000, which was not included in his estimate, and that seven-eighths of the income of the property should be paid by the city of Oakland and its inhabitants; that the cost of substituted supply to the city of Oakland with a capacity of 11,350,000 gallons would be $529,-000 per million gallons of daily supply; that, estimating the said supply of water to the Oakland division at $529,000 per million gallons of daily supply, the total annual supply would be of the value of $7,-274,000. The affidavit of L. J. Le Conte, United States Assistant Engineer, contained an appraisement made by him in 1886 as an employé of the city, in which he estimated the total probable cost at that time of the structural works of the complainant was $2,640,872, which estimate did not include real estate, water rights, rights of way, etc. Affiant stated that the estimated total cost of the complainant's works is $6,456,336.62. This estimate did not include real estate, water rights, rights of way, going business, or franchises. The affidavit of Jas. D. Schuyler, a civil engineer of experience, stated that

he testified as an expert witness in the suit in the superior court of Alameda county on behalf of the complainant; that in the year 1886 he examined and appraised the properties of the complainant, which appraisement was adopted by the council at that time in fixing the water rates; that in 1900 he carefully examined the properties constituting the Oakland division of the complainant, and found the total value of complainant's properties to be $7,637,329, in which total he included $500,000, value of going business; that in his opinion the values then found are true and correct; that the present market value of said properties constituting the Oakland division of the complainant and necessary and used in supplying water exceeds the total estimated valuation above stated.

The complainant presented a statement of the assessment for state and county taxes made for the years 1903-04, the total of which is $4,227,425, and introduced affidavits of bankers and brokers to show the prevailing rate of interest on money invested in large amounts in corporations and established quasi public corporations. Some of these affiants deposed that money could not be had for such investment at less than from 7 to 10 per cent.; the majority were of the opinion that not less than 7 per cent. was reasonable, and that at a lower rate money could not be obtained. The affidavit of William J. Dingee, president of the complainant, stated that the existing bonded indebtedness of the complainant was $4,600,000, of which sum $3,500,000 is an indebtedness, the entire proceeds of which were expended upon the properties of the corporation which are used and are necessary in conducting the business of said company in supplying water to the Oakland division; that all of said indebtedness bears interest at the rate of 5 per cent. per annum; that on May 31, 1904, the complainant owed, in addition to said bonded indebtedness, unsecured debts for improvements on its works and system used in supplying the Oakland division with water amounting to more than $500,000, which bears interest at 6 per cent. per annum, all of which is still owing; that an effort had been made to raise $1,000,000 on additional bonds prior to the election of the present mayor and council of said city, but by reason of the acts and declarations of said officers the complainant has been unable to place said bonds.

The affidavit of Edward McGary, secretary of the complainant, stated that on May 31, 1904, the total number of active services to dwelling houses and places of business in Oakland was 15,226; that more than 50 per cent. the ratepayers of which are tenants, who frequently move, and who apparently have no property over and above the exemptions to which they are entitled by law; that if the resolution fixing the rates for the fiscal year commencing July 1, 1904, shall in this suit ultimately be declared null and void, the complainant will lose the amount by which the rates are reduced as to that class of ratepayers, unless the enforcement of the resolution is in the meantime restrained, and that as to the remainder of the ratepayers, in order to recover the difference between the amount payable under the new rates and the amount receivable under the old, it will be necessary for the complainant to bring more than 5,000 suits for small amounts and

at great expense; that the number of ratepayers within the city who pay $1 or less per month for water under the former rates is 1,532, and that the total difference between the old rates and the new as to each of said consumers would be from $1.80 to $3.60 per year, and that a separate lawsuit would be necessary to collect each of these amounts; that the number of ratepayers who pay from $1.05 to $1.50 per month is 2,294; that as to each of said consumers the difference would be from $3.60 to $5.40 per year; that the number of consumers who pay from $1.50 to $2.00 per month is 3,910, and the difference between the old rates and the new as to such consumers would be from $5.40 to $7.20 per year; that the number of consumers who pay from $2 to $2.50 per month is 2,381, and the difference between the old rates and the new as to said consumers would be from $7.20 to $9.00 per year; that the number of consumers in which the rate exceeds $2.50 per month is 4,719; that the rates that have been established by the resolution which is complained of is a reduction of the former rates by about 30 per cent.; that from July 15, 1901, to and including March 1, 1903, the capital stock of the complainant consisted of 49,026 shares of the par value of $100 per share; that for the last three years, under the rates that have been in effect, the complainant paid dividends the first year at 2.52 per cent. upon the par value of its capital stock, the second year at 5.4 per cent upon the par value of its stock, the third year at .84 per cent.; that on March 1, 1903, the capital stock was increased to $5,702,600; that from that date to September 17, 1903, dividends were paid at the rate of 2.44 per cent.; that the total amount of dividends paid from January 1, 1903, to September 15, 1903, was 3.28 per cent.; that since September 15, 1903, complainant has not paid dividends, and has not been able to pay any, by reason of the impairment of its credit by political agitation in the city of Oakland favoring the reduction of its rates.

The defendants offered the report of Desmond Fitzgerald, an engineer of experience, who, at the request of the city, had made examination of the actual plant of the complainant and all the property used by it in supplying the city of Oakland and its inhabitants with water, and had, on June 3, 1903, reported the result of his investigation to the mayor. The report so made shows that the estimates were made in accordance with certain instructions from the mayor, the details of which it is not necessary here to set forth. Temescal Lake was omitted from the estimate, Claremount reservoir in Berkeley was included, parts of the distributive system belonging to the complainant outside of Oakland were included. The Piedmont tunnels and Sausal creek supplies were not included. The estimate is "exclusive of stock on hand, real estate, rights of way, and questions of equity." The total estimate of the value of the distributing plant, the San Leandro reservoir and filters, Alvarado pumping plant and wells, Claremount reservoir, Broadway reservoir and pumping plant, Linda Vista reservoir, Highland Park reservoir and pumping plant, and the Orange street reservoir, is $2,689,185. The defendants also offered in evidence the estimates placed upon the value of the complainant's property by the expert witnesses who testified on behalf of the city of

Oakland in the suit in the superior court of Alameda county, showing that C. D. Marx, professor of engineering at Stanford University, estimated the value at that time of the whole property of the complainant, exclusive of land and water rights, at $2,974,701; that C. E. Moore estimated the value at $3,900,000; that A. S. Riffle placed the value on the whole property of the complainant at that date, exclusive of land and water rights, at $2,990,537, and estimated that the total cost of producing a substantial equivalent of the same would be $2,529,064; that Wm. Hammond Hall placed the total value of the property of the complainant, including stock on hand, but excluding land and water rights, at $2,898,543, and estimated that the total cost of reproducing a substantial equivalent of the same would be $2,016,-941; that D. C. Henny valued the entire property, exclusive of land values, at $2,924,500; that Lewis A. Hicks valued the entire property, exclusive of land and water rights, at $2,950,000; that Geo. F. Allardt valued the whole property, exclusive of land and water rights, at $3,075,208, and estimated the total cost of reproducing a substantial equivalent at $3,047,061: that M. K. Miller valued the whole property, exclusive of land and water rights, at $3,225,817, and estimated that the total cost of reproducing a substantial equivalent to the same would be $2,585,334. It was shown also that, on behalf of the complainant in that case, Arthur L. Adams testified that the value of the entire property of the Contra Costa Water Company was $7,072,527; that James D. Schuyler valued the whole property, inclusive of real estate and going value, at $7,692,567; that Louis Le Conte valued the entire property, exclusive of real estate, water rights, going business, and franchises, at $6,456,336; that W. Kiersted valued the entire property of the complainant at $7,400,664. The defendants introduced also the affidavit of M. K. Miller, a civil engineer, formerly the city engineer of the city of Oakland, who estimated the value at the present time of the whole property of the complainant, exclusive of land and water rights, at $3,225,817, and estimated the cost of reproducing a substantial equivalent thereto to be $2,585,334; also the affidavit of F. C. Turner, now the city engineer of the city of Oakland, who estimated the present value of the structural features of the complainant's system at about $3,000,000.

The issues of fact presented by the bill, answers, and affidavits are sharply defined. The complainant contends that the total value of its properties is $8,500,000; that its operating expenses for the year beginning July 1, 1904, will be $113,005; that its taxes will be $128,-887: that it should be allowed on account of depreciation of its properties $82,000; and that in order to meet its expenses and to cover such depreciation, and to pay the interest on its bonds and a fair dividend to its stockholders, it is entitled to receive an annual income from its properties of $850,000. The defendants contend that the total value of the properties of the complainant does not exceed $4,000,000; that the city council allowed more than their value when it fixed the same at $4,700,000; that $126,206 is a just allowance for operating expenses, repairs, and renewals of the complainant's works; and that the taxes which the complainant will be required to pay will not ex-

ceed $50,795. These contentions are widely divergent. There is but one point on which there is substantial agreement; that is, the amount which would be earned by the complainant from the Oakland division under the rates which are fixed by the resolution. It was estimated by the city council at $459,002, of which it was considered that $418,-000 would be derived from the consumption of water in the city of Oakland. The complainant contends that the amount which would be derived from such consumption of water in the city of Oakland would be the sum of $401,800. In adopting the resolution, the city council fixed such rates as in the judgment of its members would reimburse the company for its operating expenses, renewals, repairs, and taxes, and allow it 6 per cent. upon the value of its property. The questions arise: Was the valuation sufficient, and was sufficient allowance made for operating expenses, renewals, repairs, and taxes?

The most important of these questions, and upon which the estimates most widely differ, is that of the valuation. Upon an application for an injunction pendente lite to be determined upon a consideration of the averments of the bill, the denials of the answers and the affidavits of the respective parties, and without the aid of the light which will be thrown upon the contested issues from the oral examination and cross-examination of witnesses, the court is able to consider only the salient features of the evidence, and therefrom to arrive at such conclusion as must guide judicial discretion in allowing or withholding the restraining order. Upon the one side are the affidavits of competent civil engineers, who estimate the total value of the complainant's property at more than $7,000,000, in which total the structural works appear to have been estimated at about $5,300,000. On the other side are the affidavits of competent engineers, the average estimates of which place the value of the structural works of the complainant at about $3,000,000, which, added to the estimate of the value of real estate, water, and water rights contended for by the defendants, would give the whole property of the complainant a total valuation of about $3,500,000. The mere perusal and examination of these affidavits in the narrow limit of time which is permitted for their consideration carries no conviction that the complainant will by the new rates be denied the equal protection of the laws or be deprived of its property without due process of law. Nor is the court in the possession of any test by which, at the present time, to sift the truth out of the conflicting estimates. The affidavit of one of the civil engineers offered on behalf of the complainant may be said to be discredited to some extent by evidence that on another occasion and in respect to other waterworks he estimated the cost of certain elements entering into the construction of all such works at 50 per cent. lower than his itemized estimate given in his affidavit in this case. Nearly all of the expert witnesses whose affidavits are presented in this case were witnesses in the suit in the superior court of Alameda county. The mind naturally turns to the judgment of that court rendered upon the consideration of testimony given orally with the aid of cross-examination, with full opportunity to observe the demeanor of the witnesses, and to the conclusion which it reached after an investigation which

extended over a period of seven months. No suggestion is offered to impeach the conclusiveness of that adjudication, except the fact that the defendants have appealed from it. In some states, and perhaps by the weight of judicial decision generally, it is held that, where the power of an appellate court is confined to the affirmation, reversal, or modification of the judgment or decree which is appealed from, the appeal and the supersedeas merely operate to stay execution and other final process upon the judgment, and that either party may invoke it as an estoppel. In other states, however, it is held that the perfection of an appeal suspends the judgment for all purposes and deprives it of its effect as an estoppel. It is so held by the decisions of the Supreme Court of California. · Woodbury v. Bowman, 13 Cal. 634; Murray v. Green, 64 Cal. 369, 28 Pac. 118; Harris v. Barnhart, 97 Cal. 546, 32 Pac. 589; Smith v. Smith, 134 Cal. 117, 66 Pac. 81. It becomes the duty of this court to follow the rule thus established in California under the provisions of the act of 1790, embodied in section 905, Rev. St. (U. S. Comp. St. 1901, p. 677), in which Congress has provided that the records and judicial proceedings of the state courts "shall have such faith and credit given to them in every court within the United States as they have by law or usage in the courts of the state from which they are taken." There is no opportunity here to comply with the suggestion of the court in Harris v. Barnhart, supra, in which it was said that a proper course in such a case would be to suspend proceedings in the second action until the judgment so appealed from shall have become final, after which a supplemental answer averring the proper facts in bar of the action would be in order. But while the judgment of the superior court must, by reason of the fact that an appeal therefrom has been taken, be denied the effect of an estoppel, there can be no doubt that upon this application for a restraining order it should be deemed of persuasive force as evidence, since it is the judgment of a competent court having jurisdiction, pronounced after a full and complete hearing of evidence taken in open court upon the issues involved. In Buck v. Hermance, 1 Blatchf. 322, Fed. Cas. No. 2,081, Mr. Justice Nelson said that a judgment obtained by the plaintiff against other parties sustaining the validity of its patent would be admissible, on a motion for a provisional injunction to stay the defendant from infringing pending the litigation, "as affording strong evidence of the validity of the patent and of the title of the plaintiff, not for the purpose of influencing the final result, but of preserving the rights of the parties in the meantime." In Naftzger v. Gregg, 99 Cal. 88, 33 Pac. 757, 37 Am. St. Rep. 23, Mr. Justice Harrison, concurring with the opinion of the court in reversing the judgment of the court below, referred to a judgment roll of a judgment which had been appealed from, which was offered to prove an estoppel, and which had for that purpose been received in evidence by the lower court, and said:

"The judgment roll was relevant to the issue presented by the answer, and of a character competent to establish that issue. The objection that it was not sufficient in itself for that purpose went to its weight, and not to its admissibility. It was a judgment that had been rendered between the same parties upon the same cause of action, and by a court of competent juris-

165 F.—34

diction, and, unless it is to be held that a judgment is not under any circumstances admissible in evidence until the time for an appeal therefrom has expired, the court properly received it."

In Boston & M. Consol. C. S. & N. Co. v. Montana Ore-Purchasing Co., 26 Mont. 146, 66 Pac. 752, the Supreme Court of Montana, in which state the California rule concerning the effect of a pending appeal prevails, held that, in an application for an injunction pendente lite, the court in determining the application may consider a judgment in a prior action between the parties, although an appeal has been taken therefrom. The court said:

"Why could not the fact, when brought to the attention of the court below, that it had decreed the property as not in any wise belonging to the plaintiff, be considered by it in passing upon the order to show cause why plaintiff and appellant should not have an injunction pendente lite against the defendants in the action, and be regarded in its sound discretion as sufficient reason why the injunction should be denied?"

In Smith v. Smith, supra, the court said:

"It is contended that the rule in this state is that pending the appeal the judgment cannot be used as evidence for any purpose whatever. A rule so general and absolute would manifestly be unreasonable, and goes much beyond the decisions. The rule is simply that one cannot avail himself of an adjudication establishing a right while the judgment is suspended by an appeal."

Turning to the opinion of the superior court of Alameda county in the case referred to, we find that the court said:

"Without entering into a minute discussion of the evidence, I find, after a most careful and painstaking consideration of the record, that the value of the combined properties of plaintiff, now and at the time of the commencement of this action, actually and necessarily used by it in the conduct of the business of collecting and supplying water to the city of Oakland and its inhabitants, to be, in round numbers, $7,000,000. This includes the San Leandro lake as a source of water supply, and the necessary structures appurtenant thereto, the construction work of the old Contra Costa system other than San Leandro lake, the Alvarado plant, and the element of going or established business.

"The complainant alleges that the property is of a value exceeding $8,500,-000. Mr. Adams places it near $7,500,000, while Mr. Schuyler estimates it at a higher figure. In this connection, it may be well to note the fact that the experts who testified for the defendants, with the possible exception of Mr. Henny, made no pretense of placing a value upon the plant as a whole; that is, as an entire system installed for a business purpose, with each part having relation to all the other parts. Their valuation seemed to be entirely upon the structural elements of the plant, limited to its value as an engineering construction.

"They appeared, in their estimates, not to have considered the important factor of going or established business. In fact, one of them, Prof. Marx, was made to say on one occasion that the properties under consideration, used for water-supplying purposes, would be, according to his theory and principles of valuation, just as valuable constructed on the Sahara Desert, the absence from which of water and inhabitants is a matter of common notoriety, as the plant concerning which he was giving evidence, while Mr. Hall, another expert for the defense, gravely declared, in explaining his method of valuation, that a well sunk for oil to a depth of a thousand feet, in which no oil was found, and the district in which the well was located was abandoned, would be worth, as an engineering construction, what it cost.

"When asked whether or not they would give such a valuation if called upon to estimate value for rate-fixing purposes, each of the experts for defend-

ant invariably replied that he was not competent to answer the question; that there were equities to be considered in fixing rates, with which he had no concern when called upon to give his judgment as to the value from the standpoint of an engineer, but not as a councilman or court of equity. For the reasons here briefly stated, I regard the testimony of the city's experts as a palpably unsafe guide by which to determine the value of this plant.

"Mr. Allardt, one of the expert witnesses of the defense, after giving his testimony in this cause, was called as a witness to testify before the city council, who were then engaged in investigating the rate question, for the purpose of establishing rates for the year to begin with the 1st of July of the present year, and was thereafter recalled to the witness stand by plaintiff for the purpose of further cross-examination, based upon his testimony given before said council. A careful consideration of his testimony, found at pages 6,919 to 6,963, inclusive, of the transcript, wherein he was cross-examined concerning his testimony given before the city council, goes far towards sustaining the contention of the plaintiff upon the question of valuation. While I do not believe that Mr. Allardt attempted to mislead the court in his testimony given in the first instance, I must confess that I received a very different impression from his testimony given under his last cross-examination than that which was produced upon my mind when he first testified. And this serves as another illustration of the utter unreliability, due to the manner in which they testified, of the testimony generally of the experts for the defendants for the determination of the question of the valuation of this plant.

"The value above given is, I believe, an equitable adjustment of the question of valuation, and is wholly reasonable under the evidence. The testimony, so strongly relied upon by the defendants of the cost of reduplication, as by the Pinole system, is entitled to consideration in making the estimate, but it is far from being the determinative factor of the problem, first, because of the extremely unsatisfactory showing as to the quantity of water, as to its quality and potableness; and, second, because cost of reduplication or cost of another adequate supply is by our Supreme Court distinctly declared to be nondeterminative of the question. 'It would, therefore, be highly unjust to permit the consumers to avail themselves of the plea that at the present time similar works could be constructed at a less cost as a pretext for reducing the rates.' San Diego Water Co. v. San Diego, 118 Cal. 568, 50 Pac. 636 (38 L. R. A. 460, 62 Am. St. Rep. 261).

"What has been said of the Pinole system applies with even greater force to the Roberts artesian wells. The sufficiency of the supply in the latter case is left in even greater uncertainty.

"I conclude, therefore, upon this question, that $7,000,000, in round numbers, fairly represents the value of the property of the plaintiff, whose use for water purposes has been taken by the state. In other words, this is the sum of plaintiff's investment, estimated in money, for the use of which money plaintiff is entitled to remuneration. This is in accordance with the theory and view advanced in the main opinion of the court in the San Diego Case."

There is no convincing evidence in the affidavits now presented that the property of the complainant, so estimated by the judgment of the court in that case, is now of less value than it was at the time of that decision. Taking that estimate to be approximately correct, as it seems to me in view of the circumstances it should be taken for the purposes of this motion, but for no other purpose, the conclusion necessarily follows that under the rates fixed by the resolution of May 31, 1904, assuming that the complainant's taxes will be but $50,794, as contended for by the defendants, the complainant will receive a revenue of less than 4 per cent., net, per annum upon said valuation. Assuming that the taxes will, according to the complainant's showing, be $128,887, the net revenue will be less than 3 per cent. per annum.

It becomes unnecessary upon this hearing, therefore, to further consider the question of the amount of the complainant's liability for tax-

es. The complainant assumes that for the coming year its property will be taxed as it was last year, $128,887. It admits that of the total of last year's taxes it has paid but $50,795, and that it contests its liability for the remainder thereof. The taxes so contested are taxes upon the franchises to lay pipes in the streets of the city of Oakland. The defendants deny that these franchises will for the coming year be assessed for city taxes. This, if true, does not dispose of the question of their assessability for state and county taxes. It is obviously impossible at the present time to say what taxes the complainant will be required to pay for the coming year over and above the $50,795, its admitted liability. Nor would it be possible to arrive at a conclusion concerning that branch of the case without adjudicating questions that do not properly belong to the domain of the present investigation. Those questions must be relegated to the final determination of the issues involved between the parties to this case.

The complainant undoubtedly has the right to receive from water rates an income which will enable it to pay its actual operating expenses, its taxes, its interest on its bonded or other indebtedness so far as that indebtedness represents money properly expended in or upon its property, and to pay a reasonable dividend on its stock so far as the stock represents money actually received and so invested, and in addition thereto to receive a sum sufficient to cover the annual depreciation of its plant. Said the court in San Diego Land & Town Company v. Jaspar, 189 U. S. 442, 23 Sup. Ct. 572, 47 L. Ed. 892:

"It no longer is open to dispute that, under the Constitution, what the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public."

In Stanislaus County v. San Joaquin C. & I. Co., 192 U. S. 215, 24 Sup. Ct. 241, 48 L. Ed. 406, the court, in reaffirming its ruling in San Diego Land Co. v. National City, 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154, said:

"The appellants in that case contended that in fixing what were just rates the court should take into consideration the cost of the plant and of its annual operation, the depreciation of the plant, and a fair profit to the company above its charges for its services. It was observed by the court that undoubtedly all these matters ought to be taken into consideration and such weight be given them when rates are being fixed as under all the circumstances would be just to the company and to the public."

In Spring Valley Water Company v. City, etc., of San Francisco (C. C.) 124 Fed. 574, in a case in this court similar to the present case, Judge Morrow, on an application for an injunction pendente lite, held that an ordinance adopted by the supervisors of the city of San Francisco establishing rates which would yield less than 5 per cent. upon the value of the property used and necessary to be used in the supply of water to that city operated to deny the water company the equal protection of the laws and to deprive it of its property without due process of law, and granted a temporary restraining order against the collection of rates so fixed. That precedent will be followed in this case, and the injunction pendente lite will be granted. In so holding, there is no intention to express an opinion that the conten-

tion of the complainant will ultimately prevail, nor to say that the judgment of the superior court of Alameda county will, if that case be still pending on appeal, be admissible in evidence on the final hearing of this case.

It is proper to add that I have not even approximately arrived at a conclusion upon the merits of the case. The general presumption which the law indulges, that the action of officers authorized by law to fix rates in such cases is correct, is not to be disturbed by the fact that the rates fixed by the city council in this instance create a very substantial reduction of the rates fixed by their predecessors in office. Each council must act upon its best judgment upon the evidence which is in its possession. There is in my opinion nothing in the facts shown in this case to justify the charge that in adopting the resolution which is complained of the council acted arbitrarily or were actuated by improper motives or by any purpose save to do what in their judgment was right between the complainant and the city and its inhabitants. A temporary restraining order will work no substantial injury to the defendants or to the consumers of the water. They will be amply protected by a bond to cover the amount by which the rates are reduced by the resolution. On the other hand, if the order were denied and the contention of the complainants should finally be sustained, it is evident that the complainant would be subjected to serious inconvenience and injury, notwithstanding the remedy afforded it by that section of the resolution which permits it to shut off water from premises on which the rentals are 30 days in arrears, and would be required to bring a multiplicity of suits, which it is one of the functions of a court of equity to prevent. It is a settled rule for the guidance of the discretion of courts in cases such as this to look to the balance of injury and inconvenience, and to consider whether a greater injury will be done by granting than by refusing an injunction. In United States v. Duluth, 1 Dill. 474, Fed. Cas. No. 15,001, Mr. Justice Miller said:

"When the danger or injury threatened is of a character which cannot be easily remedied if the injunction is refused, and there is no denial that the act charged is contemplated, the temporary injunction should be granted unless the case made by the bill is satisfactorily refuted by the defendant."

See, also, Palatka Water Works v. City of Palatka (C. C.) 127 Fed. 161, and City of Newton v. Levis, 79 Fed. 715, 25 C. C. A. 161, and cases there cited, and Indianapolis Gas Co. v. Indianapolis (C. C.) 82 Fed. 245.

An injunction will be allowed as prayed for, restraining the defendants pendente lite, or until the further order of the court, from enforcing the resolution of May 31, 1904, and the complainant will be required to give a bond in the sum of $130,000 to answer for all damages which the defendants or any person injured by reason of the injunction may sustain, if, upon the entry of the final decree herein upon the merits, said resolution shall be sustained.