ALAMITOS LAND COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 84807. Promulgated July 28, 1939.

*Melvin D. Wilson, Esq.*, and *Thomas B. Irvine, Esq.*, for the petitioner.

*Byron M. Coon, Esq.*, for the respondent.

OPINION.

Van Fossan: The basic issue in this proceeding is whether or not the petitioner received income of $522,895.11 at the time of the payment of such sum by Shell in 1932.

The petitioner contends that under the stipulated facts it derived no income from the payment because it was not a profit received by the petitioner for its separate use, for its benefit, or for its disposal. The petitioner relies on *Eisner* v. *Macomber*, 252 U. S. 189, particularly the following paragraph thereof:

\* \* \* Here we have the essential matter: *not* a gain *accruing to* capital, not a *growth* or *increment* of value *in* the investment; but a gain, a profit, something of exchangeable value *proceeding from* the property, *severed* from the capital, however invested or employed, and coming *in*, being "derived", that is *received* or *drawn* by the recipient (the taxpayer) for his *separate* use, benefit, and disposal; *that* is income derived from property. Nothing else answers the description.

The respondent's position is that the petitioner received the title and possession of the payment with no restrictions as to its use, and cites in support thereof *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417, as the leading case on the subject.

Reviewing briefly the pertinent facts stipulated in the record, we find that in 1931 suit was brought by the petitioner against Shell for the recovery of royalties alleged to have been withheld by Shell. In April 1932 the trial court gave judgment to the petitioner for additional royalties, interest, and costs, and imposed a forfeiture of the lease unless the judgment should be paid by August 29, 1932. On July 8, 1932, Shell paid the judgment, costs, and interest to that date, but specifically stated that payment was made "involuntarily and solely by virtue of duress, coercion and compulsion of said judgment."

Shell appealed to the Supreme Court of California, which entertained the appeal and on January 9, 1933, denied the petitioner's motion to dismiss the appeal.

The petitioner deposited the cashier's check, tendered by Shell, in a term deposit bank account and made an entry on its books "to record the payment" thereof. The petitioner also spread upon its books a comprehensive recital of the conditions under which the payment was made and received. Shepard-Pendleton, which had a 35 percent interest in the judgment, agreed to the disposition of the fund and also consented to the change in the form of the investment of a part of the fund from the deposit account to Treasury notes. The item was not accrued on petitioner's books nor included in its tax return. On the contrary, petitioner explained in its return how the money was received and held pending determination of appeal of the case.

After reversal, upon appeal, the petitioner tendered to Shell the amount of its original payment, together with all the gains and profits earned by the fund while in the petitioner's custody, and gave a complete accounting of its transactions relating to the fund.

We have here an unusual situation. The judgment of the trial court imposed the penalty of forfeiture of the lease if payment of the judgment were not made by a given date. For some undisclosed reason, Shell did not appeal from that portion of the judgment, but preferred to pay and then perfect its appeal. Unquestionably, at the time of payment, it was the understanding of the petitioner, Shell, and Shepard-Pendleton that an appeal would be taken. In referring to the harshness of the decree of the lower court, the Supreme Court of California, in *Alamitos Land Co.* v. *Shell Oil Co.*, 17 Pac. (2d) 998, said:

* * * It is manifest that in the face of the alternative to pay or lose the lease and then pay, it was wise for defendant to advance and pay the money demands. Such a payment, therefore, was under the clearest and most urgent compulsion and should not bar the right of review. Defendant received no benefits by accepting the lighter of the two burdens. It merely adopted the only safe course.

The petitioner's theory, that it did not have unrestricted use of the fund but held it for the benefit of the winner of the pending litigation, is borne out by its action in securing an agreement with Shepard-Pendleton to place the fund on time deposit. That company was the owner of 35 percent of the amount, if any, to be recovered from the judgment and before final determination had a property right therein to that extent. If Shell won, the fund and its accretions would go to it; if the petitioner won, it and Shepard-Pendleton would share the fund.

Under similar circumstances, the courts of California have held that a judgment pronounced by a lower court is not final with reference to property or rights affected thereby so long as it is subject to appeal and liable to be reversed. *Hills* v. *Sherwood*, 35 Cal. 474; *Estate of Blythe*, 99 Cal. 472; 34 Pac. 108; *Cook* v. *Ceas*, 143 Cal. 221; 77 Pac. 65; *contra*, *Costa Water Co.* v. *City of Oakland*, 165 Fed. 518. In *Ward* v. *Sherman*, 155 Cal. 287; 100 Pac. 864, the Supreme Court of California said:

There is no dispute between the parties as to the rules of law governing an action of this kind. Where a judgment or decree of an inferior court is reversed by a final judgment on appeal, a party is generally entitled to restitution of all the things lost by reason of the judgment in the lower court; and accordingly, the courts will, where justice requires it, place him as nearly as may be in the condition in which he stood previously. (*Cowdery* v. *London, etc. Bank*, 139 Cal. 298 (96 A. St. Rep. 115, 73 Pac. 196); Freeman on Judgments, Sec. 482.) The restitution may be directed and provided for in the original action itself (Code Civ. Proc., Sec. 957), or may, as here, be sought in a separate action, instituted

for that purpose. (*Cowdery* v. *London etc. Bank*, 139 Cal. 298 (96 A. St. Rep. 115, 73 Pac. 196) and cases cited.) In such action the defendant must account for the property received under the judgment which has been reversed and the rule governing the extent of his liability is that applicable to a trustee, which, in 28 Am. & Eng. Ency. of Law, 2d Ed., p. 1059, is stated as follows: "The general doctrine being that trustees ought to conduct the business of the trust in the same manner as an ordinarily prudent man of business would conduct his own, they will not be chargeable with more than they have received nor held responsible for losses that may arise, when they have acted in good faith and with common skill, prudence and diligence."

Thus it is that, on receipt of the fund, it could not be said that petitioner received it free of limitation and for its unrestricted use.

In *Virginia Iron Coal & Coke Co.*, 37 B. T. A. 195; affd., 99 Fed. (2d) 919, the Board considered a case where payments were made in 1930 and 1931 under an option to purchase, which payments were to be applied to the purchase price in case the option was exercised but were to be retained in case the option was not exercised. The option was surrendered in 1933. In holding that the payments were income in 1933 the Board stated:

Thus it was impossible for either the taxpayer or the Commissioner to determine in 1930 and 1931 whether or not the payments would eventually represent income and how they should be reported. * * *

Thus it is necessary to exclude such payments from the income of the year in which received and to include them for the later year when, for the first time, a satisfactory determination of their character for income tax purposes can be made. The other party to the contract in the taxable year for the first time released and abandoned its right under the agreements to have the payments applied against the purchase price, and charged off its loss. The recipient then knew for the first time that it could retain the payments without any obligation to apply them against the purchase price.

So it is here, in 1932, when the fund was received and set apart by taxpayer it was impossible for either the taxpayer or the court to determine when, if ever, the payment would be income. Here, as in the cited case, there was a limitation attached at the time of receipt, a limitation fixed by California law and incident to the right of the losing party to appeal, that is, that the fund be held intact pending appeal and if necessary restitution be made. As it worked out in the instant case it was necessary for taxpayer to make restitution in full. In the light of such fact the payment in 1932 was never true income. Clearly also, in the light of such fact, it would be a gross injustice to tax petitioner with income in 1932, depending for equalization on the uncertainty of a deduction from income later. Where possible, tax cases should be decided on realities and not on abstract hypotheses.

The conclusion we have reached, that petitioner was not taxable in 1932, is supported also by the decision of the Board in *Sara R. Preston*, 35 B. T. A. 312, where two attorneys who had performed services for clients received a check in payment payable to order of both, but could

not agree on the amount to which each was entitled. They deposited the check in a bank in a joint account and in the taxable year each drew down such amount as the other conceded, agreeing that the balance should be drawn only on settlement of the dispute. Taxpayer reported only the amount actually received. Respondent held the entire fund constructively received. We sustained the taxpayer, citing, among others, *Eisner* v. *Macomber*, 252 U. S. 189; *Commissioner* v. *Cleveland Trinidad Paving Co.*, 62 Fed. (2d) 85; *Stoner* v. *Commissioner*, 79 Fed. (2d) 75. In the last cited case the court held that a stockholder's share of an amount deposited, out of proceeds of the sale of corporate stock by a stockholder who acted on behalf of all the stockholders, as an indemnity fund to insure buyer of the fulfillment of the seller's obligations, was not taxable income of the year so deposited, since such stockholder had only qualified possession and control of the whole fund, and was not entitled to his share until the terms of the contract were fulfilled. Certiorari was denied, 296 U. S. 650.

The facts here present distinguish this case from *North American Oil Consolidated* v. *Burnet, supra*. Here it can not be said that the taxpayer received the fund without restriction as to its disposition. The law of California imposed a restriction. Petitioner here recognized that it held the money subject to very positive limitations. It did not set it up on its books as its own, nor did it claim it as its own in its tax return. On the contrary, it explained its true character. Its treatment of the fund was, of itself, a disclaimer of a present right to unrestricted use. In the cited case the funds were unquestionably income, the matter in dispute being the year of accounting. Here, as determined by the Supreme Court of the state, petitioner never had a right to the fund and accordingly it never possessed the character of true income.

We are of the opinion that the fund of $522,895.11 paid in 1932 and the accretions thereto in 1932 and 1933 were not income to petitioner in those years.

In view of our decision on the first, and major, issue, it is unnecessary to discuss the second and third issues. The interest paid on the fund of $522,895.11 during 1932 and 1933 and received by the petitioner was accounted for and paid to Shell and, hence, is not taxable to petitioner. The amount of $182,205.76, representing the interest of Shepard-Pendleton in the proceeds of the judgment, is claimed by the petitioner as a deduction only in the event that it is held taxable on the trust fund. It was not deducted in the petitioner's income tax return for 1932 and, consequently, no question is raised for us to decide.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

DISNEY, dissenting: I can not see why the very language of *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417, does not preclude the correctness of the majority opinion, for it is in that case said that if the taxpayer receives earnings under a claim of right without restriction as to its disposition, they are income "even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." Thus, the matter of a reversal of judgment seems particularly in the mind of the Supreme Court of the United States. Therein money was received from oil lease in 1917. The United States, the other party to the litigation, appealed, without supersedeas. In 1920 the Circuit Court, to which appeal was taken, affirmed the decree, and in 1922 further appeal to the Supreme Court was dismissed by stipulation. It was held that the money was income not for 1922, but for 1917, and the Court said in addition to what has been above quoted:

\* \* \* If in 1922 the government had prevailed, and the company had been obliged to refund the profits received in 1917, it would have been entitled to a deduction from the profits of 1922, not from those of any earlier year. \* \* \*

The majority opinion seems based upon the fear that there is injustice in the taxpayer's paying taxes "depending for equalization on the uncertainty of a deduction from income later." I think, on the contrary, that the Government should be allowed to collect the tax when taxpayer receives the money, and that it is only fair for him to get his credit, so to speak, when he pays it out again, for the simple reason that otherwise he may receive the money, may go bankrupt, or otherwise never restore the money, and thus receive income upon which he is never taxed. It seems to me that the uncertainty of his repaying the money is greater than the uncertainty of the Government allowing him a just deduction when he in fact makes restitution. I do not think that the United States should be forced to depend upon the uncertainties of the fortunes of a taxpayer who has received money with no restriction as to disposition, when there is available a simple method of giving him credit in later years, if it turns out that he returns the money.

There was no restriction upon taxpayer's use of the money. Shell had no lien upon it. In fact, taxpayer used it in part to purchase securities, and it might have bought yachts or used it in riotous living. It had to put up no bond for the receipt of the money, and was obligated only as a common debtor to return it. If other creditors had judgments against it at the time of restitution, I think they might well, in some circumstances, have prevented the restitution of this money to the Shell Oil Co. as a preference among creditors. It did receive it under a claim of right, as is shown by the notice to the Shell Co. that,

if the money was paid, petitioner would move to dismiss the Shell appeal—which it did, although it was unsuccessful. It received it under a claim of right, for the money was merely what it sued for. The taxpayer here was not forced to segregate this money, but did so voluntarily.

*Sara R. Preston*, 35 B. T. A. 312, does not help, but rather bears out my conclusion, because there was a restriction, that is, the restriction of the other party to whom a joint check was made and who disagreed with the petitioner about the use thereof; whereas the petitioner was charged with income of that money which he received by agreement with the other party, out of the check. It is plain that there was a positive restriction in that case upon the use of the money in that he could not use it at all, whereas here petitioner had the unrestricted use of the money. The only restriction was a voluntary one on its part for its future financial protection. I think the restriction involved in these cases is in its nature not a voluntary one, but some matter of law or other force which restricts or prevents the use of the money by the possessor.

In *National City Bank* v. *Helvering*, 98 Fed. (2d) 93, holding that O'Neil had income on bonds received by him, even though he received them surreptitiously, with liability to account for them later, it was said:

\* \* \* Although taxes are public duties attached to the ownership of property, the state should be able to exact their performance without being compelled to take sides in private controversies. Possession is in general prima facie evidence of ownership, and is perhaps indeed the source of the concept itself, though the time is long past when it was synonymous with it. It would be intolerable that the tax must be assessed against both the putative fortfeasor and the claimant; collection of the revenue cannot be delayed, nor should the Treasury be compelled to decide when a possessor's claims are without legal warrant. If he holds with claim of right, he should be taxable as an owner, regardless of any infirmity of his title; no other doctrine is practically possible, and no injustice can result. We think therefore that O'Neil was taxable upon the bonds for the years 1922 and 1923.

In *Champlin* v. *Commissioner*, 78 Fed. (2d) 905, the Tenth Circuit, in a case as to income from a lease subject to litigation, said:

\* \* \* It is stated in the briefs and not denied that petitioner in 1923 requested the Commissioner to treat the income from the lease as impounded pending the litigation over the title, and that the taxes be assessed when ownership was determined. Whether this be so or not, the law is that petitioner was liable for the tax on the income received despite the uncertainty of the litigation.

In *Victoria Paper Mills*, 32 B. T. A. 666; affd., 83 Fed. (2d) 1022, the petitioner obtained judgment against the city of Fulton, assigned the judgment to a bank, and received the money thereon in 1931, the same year in which he received the judgment. The judgments have never

been paid by the city of Fulton "and the question of the city's liability for the amounts thereof is still in litigation in the courts of the State of New York." The petitioner guaranteed the payment of the judgments by the city of Fulton, and we held that the amount received constituted income. The only difference between that case and the present case is that the Shell Co. paid the money instead of it being raised by assignment of the judgment against Shell. Certainly there was the same liability for repayment of the judgment.

In *D. H. Byrd*, 32 B. T. A. 568, petitioner received funds subject to an unliquidated claim then pending liquidation. Petitioner denied the claim, asserting his right to the whole amount throughout the taxable year 1931, and until October 1933, when the litigation was determined. We said that until that time it was not "known whether petitioner's right to receive the money would ever be disturbed, or whether he would ever be required to pay over any part of it to the Owen-Sloan Oil Co.", and held that he was taxable on the entire amount. The Owen-Sloan Oil Co. had instituted a suit in the United States District Court for Texas, claiming that it had a contractual right to one-half of the moneys. In 1933 judgment against petitioner was announced, but was settled pending a hearing on the amount. Petitioner apparently received the money before the Owen-Sloan Oil Co. had brought the suit.

I therefore dissent.

TYSON agrees with this dissent.