SPRING VALLEY WATER CO. v. CITY AND COUNTY OF SAN FRANCISCO et al.

(Circuit Court, N. D. California. June 29, 1904.)

No. 13,598.

1. COURTS (§ 282*) — FEDERAL COURTS—JURISDICTION—CONSTITUTIONAL QUESTIONS—REASONABLENESS OF WATER RATES.

Whether rates to be charged by a water company, fixed by a municipal ordinance under constitutional or statutory authority, are reasonable or unreasonable, is a judicial question, and the company has the right to invoke the jurisdiction of a federal court to determine whether such rates are such as to deprive it of its property without due process of law.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 282.*

Jurisdiction of cases involving federal question, see notes to Bailey v. Mosher, 11 C. C. A. 308; Montana Ore-Purchasing Co. v. Boston & M. Consol. Copper & Mining Co., 35 C. C. A. 7.]

2. INJUNCTION (§ 136*)—PRELIMINARY INJUNCTION—GROUNDS—ORDINANCE ESTABLISHING RATES.

A preliminary injunction granted enjoining the enforcement of an ordinance passed by the board of supervisors of the city and county of San Francisco fixing the rates to be charged by a water company on a showing from which it appeared that under such rates the company could not

---

make a net income equal to 5 per cent. on the value of the property employed in the service.

[Ed. Note.—For other cases, see Injunction, Dec. Dig. § 136.*]

In Equity. On motion for preliminary injunction.

M. B. Kellogg and Francis J. Heney, for complainant.

Percy J. Long and John S. Partridge, for defendants.

GILBERT, Circuit Judge. An application for a temporary restraining order is made upon the bill of the Spring Valley Water Company, the answer of the city and county of San Francisco and the board of supervisors thereof, and the affidavits submitted on behalf of the respective parties.

The substantial averments of the bill are the following: That on March 7, 1904, the board of supervisors of said city and county passed an ordinance fixing the rates to be collected by the complainant for water furnished to the city and inhabitants thereof for the fiscal year beginning July 1, 1904, and ending June 30, 1905, whereby they reduced the rates which had been fixed under their ordinance of March, 1902, to be in effect and in force for the fiscal year beginning July 1, 1902, and which had continued in force during the ensuing year. That the amount of such reduction was 7 per cent., except in respect to the hydrant rate, which rate they reduced 50 per cent., thereby reducing the monthly revenue derivable from hydrant service from $2 per month to $1 per month. The bill then sets forth in detail the properties which have been acquired by the complainant and which are used in supplying water, and the value thereof, alleging that the total value thereof at the present date is $50,000,000; that the complainant is the successor of the Spring Valley Waterworks, the corporation which had constructed and operated the plant up to September, 1903; that in acquiring the said properties the complainant assumed and covenanted to pay all the bond issues which had been executed and put upon the market by its predecessor, also to issue stock to the stockholders thereof; that the amount of issued capital stock of its predecessor is $14,000,000, par value; that the par value of the stock issued by the complainant is $28,000,000; that the money invested in the complainant's plant, represented by stock and bonds, is $28,000,000 or $29,000,000, actual money. The bill then sets forth the dividends that had been declared upon the stock of the old company from the time of its inception in 1859 down to the end of the year 1902, and alleges that large amounts of these dividends which should have been declared were left by the stockholders of that company for investment in its property, and that, allowing for these accumulations, and deducting from the dividends those actually declared and paid with interest upon them, the balance of the cost of the works of the complainant, according to its books, is a little more than $38,000,000; that the old company paid in the year 1875 dividends of 9 per cent. per annum upon its stock, during which year the current rates of interest in San Francisco upon good mortgage securities was 9 per cent.; that from that year down to the commence-

ment of the year 1879 the dividends remained practically the same; that in 1879 the dividend became 8 per cent., but the current rate of interest remained at 9 per cent.; that from 1879 to 1883 dividends continued to be 8 per cent., except that in the latter year the dividend was 2⅔ per cent.; that in 1884 it was 4½ per cent.; that for the four years following it was 6 per cent., during all of which times the current rates of interest were 7 per cent.; that in 1889 the dividend declared was 3½ per cent.; that in the years 1891, 1892, 1893, 1894, and 1895, a dividend of 6 per cent. was paid, and the current rate of interest was 7 per cent.; that in 1896 a dividend of 5½ per cent. was paid, and in 1897 a dividend of 6 per cent., during both of which years the current rate of interest was 7 per cent; that in 1899 the dividend was 5⅛ per cent.; that in 1900 it was 5¼ per cent.; in 1901, 3.78 per cent.; and in 1902, 4.2 per cent.; that in 1903, the enforcement of the ordinance passed in that year having been enjoined by this court, leaving the rates established under the ordinance of 1902 in force, the dividend was 4.6 per cent., during which time the ratio of interest on first-class mortgage securities was 6 per cent.; that the effect of the reduction of the rates so fixed by ordinance during the year last mentioned was to reduce the value of the shares of the complainant from $103 in 1899, the highest figure it reached, to less than $70 at the present time; that, according to the best information and belief of the complainant, its reasonable and necessary operating expenses for the coming fiscal year will be $560,000; that in estimating the revenue to which the complainant is entitled the board of supervisors fixed no sum whatever for operating expenses; that it allowed for taxation only the sum of $345,000; that according to the best information available and the belief of the complainant the taxes for the coming year will amount to $449,000; that for the past fiscal year the complainant's property was assessed for, and it paid taxes in the sum of, $325,278.21; that since the date of that assessment it has invested in permanent improvements of its property $680,700; that the assessor appeared before the board of supervisors while they were discussing the rates to be fixed by the ordinance of March 7, 1901, and stated that he proposed to raise the assessment against the complainant in the city and county of San Francisco by the sum of $3,822,000; that a large portion of the complainant's property is located in other counties in which it is also subject to taxation; that the par value of the capital stock of the complainant is $28,000,000, divided into 280,000 shares of $100 each, and that it is owned by 1,800 stockholders; that the complainant has in operation in the city of San Francisco 4,053 hydrants; that in April, 1903, the complainant's predecessor, the Spring Valley Waterworks, brought a suit in equity against the city and county of San Francisco and the then board of supervisors to enjoin and to set aside as void, unreasonable, and confiscatory the ordinance passed by the board of supervisors on March 9, 1903, and that upon an order to show cause and a hearing thereon had this court did enjoin, pendente lite, the enforcement of said ordinance, and that said injunction still remains in force, and said action has not yet been determined, but is still pending; that for the purposes of said hearing

the court considered the value of the said complainant's property therein to be $26,752,500, and that it was entitled to receive at least 5 per cent. on the value of its property as a net compensation, and that the said ordinance would not produce more than 4.40 per cent. of such value; that, since the time of said hearing, $680,767.01 has been expended in permanent improvement upon the waterworks of the complainant, and there has been no diminution in the actual value of said properties, but on the other hand there has been an increase in their actual value; that there has been no diminution in the ordinary and usual rates of interest or in the value of such services since said hearing in said former suit; that according to complainant's best information and belief there will be no material increase in its income in the fiscal year beginning July 1, 1904; that under the ordinance adopted March 7, 1904, the dividends which complainant will be able to pay to stockholders for the fiscal year beginning July 1, 1904, will not exceed 3 per cent.; that the interest on the bonded indebtedness of the complainant which it will be required to pay during the fiscal year beginning July 1, 1904, will amount to $715,000.

The defendants in their answer make denials of many of the allegations of the bill concerning the cost and value of certain specified items of the complainant's property, and deny that the total value thereof is greater than from $20,000,000 to $24,000,000. They deny that the interest on the bonded indebtedness will be $715,000, or that the operating expenses of the complainant will be $560,000, or any more than $400,000, and they deny that the taxes which the complainant will be required to pay during the fiscal year beginning July 1, 1904, will be more than $240,000. The answer alleges that the board of supervisors of said city and county fixed the rates embodied in the ordinance of March 7, 1904, after full, fair, and just inquiry of the question of reasonable compensation to the complainant for supplying water to the city and county of San Francisco and its inhabitants, and conducted a public, open, free, full, and fair investigation of said questions, and gave to the complainant full opportunity to present evidence, to produce witnesses, and to cross-examine the witnesses produced before the board; that in fixing the rate, as it was fixed by the said ordinance, the board followed minutely and conscientiously the provisions of the laws of the state of California and of the charter of said city and county.

On behalf of the complainant, Pelham W. Ames, the secretary of the complainant, made affidavit that by the books of the complainant it is shown that the total cost of the tangible assets of complainant on January 1, 1904, was the sum of $38,799,040.01; that for the fiscal year 1903–04 its taxes were $325,278.21; that the assessor for said city and county has notified the board of supervisors that for the fiscal year 1904–05 for said city and county he will increase the assessment of the complainant's property by the sum of $3,822,000 over and above the assessment for the preceding fiscal year; that since the assessment of the preceding year the sum of $680,767.01 in investments has been made to the complainant's properties; that at the rates of the previous fiscal year the complainant's taxes for 1904–05 will be $449,000, but that, upon information and belief, the rate of

taxation in said city and county will be raised from $1.076, the rate of 1903–04, to $1.20 for the ensuing year, which will make the complainant's total taxes $467,000 for 1904–05; that the total operating expenses of the company for the year ending July 1, 1904, will be $560,000.

The complainant then introduced affidavits of bankers and brokers familiar with the income yielded by investments of large amounts of capital in San Francisco, stating that the customary net income from investments in corporations judiciously managed is 6 or 7 per cent., and that capital could not be obtained for investment in quasi public or public utility corporations at a lower rate than that, and some of the affiants placed the rate at from 7 to 10 per cent.

The affidavit of Geo. E. Booker, chief clerk of the complainant and for 30 years in its employment, states that on March 7, 1904, the total number of ratepayers for water in the city and county of San Francisco was 48,221, and that they paid for water furnished to 50,534 dwelling houses and 22,028 places of business; that, of said 50,534 dwelling houses, more than 50 per cent. of the ratepayers are tenants who move frequently and have no property over and above the exemptions to which they are entitled by law, and that the power of the complainant to shut off the supply of water from the premises occupied by them constitutes its sole protection for the collection of its rates for water furnished; that the difference between the amount the complainant would receive from said ratepayers under the old rates and the amount it would receive for the rates fixed for the fiscal year beginning July 1, 1904, would be absolutely lost to the complainant, and could never be collected if the ordinance of March 7, 1904, should ultimately be declared void by the judgment of the court; that as to the remainder of the ratepayers the complainant, in order to recover such difference, would be compelled to bring many suits for small amounts, and in the majority of such cases the attorneys' fees would more than exceed the amounts to be recovered; that in the judgment of the affiant, if the new ordinance should be ultimately declared void in this suit, more than one-half of the total amount of the difference between the sums collectible under the old rates and those collectible under the new would be absolutely lost to the complainant unless the enforcement of the new rate is enjoined pending this suit. He further deposed that upon careful computation he estimated that the gross income under the ordinance of March 7, 1904, for the fiscal year beginning July 1, 1904, would be $1,976,250, and that after deducting $560,000, the operating expenses, and $449,000, the estimated taxes, the remainder or net income would be $967,250, which sum is 5 per cent. only on $19,345,000, and that upon a valuation of $26,752,500, as valued by this court in June, 1903, in the former suit, with cash expenditures and additions since amounting to $680,767, or a total capital of $27,433,267, the net income would be less than 3.53 per cent., and that upon a capital of $29,000,000 the net income would be less than 3.33 per cent; and the affiant proceeded to show that the sum of $18,000 should be added to the estimate of taxes on account of the increased rate of taxation above alluded to.

H. Schussler, for more than 37 years the chief engineer of the

complainant, in his affidavit stated in detail the values of the various items of the complainant's property, estimated the total valuation of the same at $53,047,600, and the value of its established business and its franchises at $6,000,000. He deposed that $560,000 is a conservative estimate of the complainant's operating expenses for the fiscal year 1904–05, setting forth an itemized list thereof.

The defendants offered the affidavit of Chas. W. Fay, the clerk of the board of supervisors, to show the sessions and the proceedings of the board, and the evidence considered by it in fixing the rates established by the ordinance which is complained of. It is unnecessary to refer to it in detail. It is sufficient to say that it appears therefrom that the board took pains to obtain all the information available to it, and gave free opportunity to the complainant to present its evidence and to examine the witnesses on whose evidence the board acted. Nothing is disclosed in these proceedings, nor is anything shown in evidence on this hearing, which tends to indicate that the board acted otherwise than in good faith and with an honest purpose to arrive at a fair valuation of the complainant's property, and to fix a reasonable rate of compensation for its water and service. It appears from the affidavit of Mr. Fay that among other papers placed before the board, and upon which it acted, was an unverified report made by C. E. Grunsky, then city engineer of San Francisco, in which he estimated the value of the complainant's properties at $24,-673,212, in addition to which he added $1,500,000 for what he designated as "going business," but in which he made no valuation of the complainant's franchise.

The defendants offered also the affidavit of A. Wenzelburger, a public accountant, who for five months past had been engaged in experting and examining the books of the complainant, which shows that he found the total of tangible properties of the complainant, as shown by its trial balance on December 31, 1903, to be $25,558,100.08, and that he found certain items charged to operating expenses which in reality went into part of the permanent improvements of said company; that the amount so erroneously charged to operating expenses he found for three consecutive years to be $217,337.87, and that there were other items so charged to operating expenses for the last three years, which items should have no place in operating expenses, amounting in all to $236,759.66; that the trial balance for one year shows a large sum charged to new construction account, but that nothing has been deducted from new construction account for depreciation, and that no sum is charged for depreciation, with the exception of the stable equipment account, which in 1904 amounted to $799,066.

The affidavit of J. H. Dockweiler, a civil engineer, states that the affiant for four months last part had been engaged in examining the properties of the complainant; that he finds that certain of its properties are not in use for supplying water to the city and county of San Francisco, and that the cost of such properties which are not in use is placed in the statement of the complainant at the sum of $1,873,-717.77; that he has examined and prepared a map of the lands and properties of the complainant in the counties of Calaveras, Alameda, and Santa Clara, amounting in all to 7,392 acres, no portion of which

is in use for the storage and impounding of water nor for reservoirs, dams, or conduits or for any works employed for storing water for the inhabitants of the city and county of San Francisco; that the average cost per acre of the land on which are situated the complainant's infiltration galleries was the sum of $78.72 per acre; that the average cost per acre of the complainant's lands in the Sunol Valley did not exceed $40 per acre; and that the average cost of the land on which the Pleasanton Wells are situated was $239.63 per acre.

An affidavit was produced showing that Mr. Ames, secretary of the complainant, testified before the supervisors that the rate of interest on the first-mortgage bonds of the complainant, being the amount of $1,975,000, was 6 per cent. per annum, and that the interest upon the remainder of the complainant's bonds was 4 per cent.

The affidavit of A. J. Rich, a dealer in real estate, stated that the average rate of income upon large investments in real estate investments of the sum of $1,000,000 or over in said city and county is from 4 to 4½ per cent. per annum at the present time.

A. H. Wenzelburger further stated by affidavit that upon an examination of the books of the complainant he found the bond and stock issue of the Spring Valley Waterworks, the predecessor of the complainant, to be, bonds, $13,975,000, stock issue, $14,000,000, making a total of $27,975,000, for which the company received in cash and property only $23,122,443.15; that, of the difference between said totals, $3,956,479 represented capital stock authorized, but not issued or paid in.

The defendants by their answer deny the power of the court to interfere with the enforcement of an ordinance made under legislative authority, and challenge the jurisdiction of the court to entertain the bill. The jurisdiction is invoked on the ground that the rates established by the ordinance so far unjustly deprive the complainant of its property and of the use thereof as to be repugnant to the clause of the fourteenth amendment, which forbids any state to deny any person within its jurisdiction the equal protection of the law, and to deprive the complainant of its property without due process of law. There can be no doubt of the jurisdiction of the court, upon the case which is stated in the bill. While the board of supervisors have the unquestioned right to regulate the charges to be made by the complainant for its water, the regulation must be reasonable and not confiscatory, and it is well settled that the question of the reasonableness or unreasonableness of the regulation is one for judicial determination. In Regan v. Farmers' Loan & Trust Company, 154 U. S. 397, 14 Sup. Ct. 1047, 38 L. Ed. 1014, the court, referring to the limit of judicial inquiry and the jurisdiction of the courts in such cases, said:

"There can be no doubt of their power and duty to inquire whether a body of rates prescribed by a Legislature or a commission is unjust and unreasonable, and such as to work a practical destruction to rights of property; if found so to be, to restrain its operation."

And the court (page 399 of 154 U. S., page 1055 of 14 Sup. Ct. [38 L. Ed. 1014]) added:

"There is nothing new or strange in this. It has always been a part of the judicial function to determine whether the act of one party (whether that

party be a single individual, an organized body, or the public as a whole) operates to divest the other of any right of person or property. * * * The equal protection of the laws, which by the fourteenth amendment no state can deny to the individual, forbids legislation, in whatever form it may be enacted, by which the property of one individual is, without compensation, wrested from him for the benefit of another or for the public."

These views were subsequently affirmed in Covington, etc., Turnpike Company v. Sanford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560, and in San Diego Land Company v. National City, 174 U. S. 753, 19 Sup. Ct. 810, 43 L. Ed. 1154, in which Mr. Justice Harlan, speaking for the court, said:

"That it was competent for the state of California to declare that the use of all water appropriated for sale, rental, or distribution should be a public use and subject to public regulation and control, and that it could confer upon the proper municipal corporation power to fix the rates of compensation to be collected for the use of water supplied to any city, county, or town, or to the inhabitants thereof, is not disputed, and is not, as we think, to be doubted. It is equally clear that this power could not be exercised arbitrarily and without reference to what was just and reasonable as between the public and those who appropriated water and supplied it for general use; for the state cannot by any of its agencies, legislative, executive, or judicial, withhold from the owners of private property just compensation for its use. That would be a deprivation of property without due process of law."

See, also, Chicago, Burlington, etc., Railroad v. Chicago, 166 U. S. 226, 17 Sup. Ct. 581, 41 L. Ed. 979; Smyth v. Ames, 169 U. S. 524, 18 Sup. Ct. 418, 42 L. Ed. 819; and San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 23 Sup. Ct. 571, 47 L. Ed. 892. It is equally well established that the judiciary ought not to interfere with the rates established under legislative sanction, unless—

"they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of property for public use without such compensation as under all the circumstances is just both to the owner and the public." San Diego Land Company v. National City, 174 U. S. 754, 19 Sup. Ct. 804, 43 L. Ed. 1154.

In other words, judicial interference is permissible only in a case where it is clearly shown that the legislative regulation of rates is such as to deny to the owner just compensation for his property or services taken for public use. What is just compensation is well defined in Virginia & Truckee Railway Company v. Henry, 8 Nev. 170, in which it was said:

"It is difficult to imagine an unjust compensation; the work 'just' is used evidently to intensify the meaning of the word compensation, to convey the idea that the equivalent to be rendered for property taken shall be high, substantial, full, and ample; and no legislation can diminish by one jot the rotund expression of the Constitution."

In San Diego Water Co. v. San Diego, 118 Cal. 556, 50 Pac. 633, 38 L. R. A. 460, 62 Am. St. Rep. 261, Mr. Justice Van Fleet said:

"The question of what is just compensation in such a case is, we think, in all respects analogous to the question which arises in every case of appropriation under the power of eminent domain, and it may be reduced to the formula that the public must pay the actual value of that which it appropriates to the public use."

Chief Justice Beatty, concurring with the majority of the court on that branch of the case, said:

"In fixing water rates, it is the duty of the city council to provide for a just and reasonable compensation to the water company. Anything short of that is simple confiscation, and is not only a violation of constitutional rights, but is an extremely shortsighted policy. Rates ought to be adjusted to the value of the service rendered, and this means that the water companies should be allowed to collect annually a gross income sufficient to pay current expenses, maintain the necessary plant in a state of efficiency, and declare a dividend to stockholders equal to at least the lowest current rates of interest, not on the par or market value of the stock, but on the actual value of the property necessarily used in providing and distributing the water to consumers."

The estimates of the value of the complainant's property found in the affidavits are so widely contradictory that it would be impossible in the very brief time which is allotted me for the disposal of the application for the restraining order to arrive at even an approximate estimate of its true value. The decision of Judge Morrow on the case between the same parties decided in this court a year ago, Spring Valley Waterworks v. City, etc., of San Francisco (C. C.) 124 Fed. 574, will, in this opinion, be regarded as a controlling precedent. The court in that case estimated the total value of the properties then used in supplying water to the city and county of San Francisco at $26,-752,500, and reached the conclusion that a just annual compensation for the use thereof to be paid by the city and its inhabitants was 5 per cent. per annum. Taking those figures as a basis, the question arises, in what particulars does the present case differ from the former case? Since the date of that decision, the complainant has added to its investments the sum of $680,767 01. On the hearing of the former case, the taxes were shown to be $286,390, and the annual operating expenses were found by the court to be $506,000. Assuming the estimate of the complainant for its operating expenses and taxes for the year beginning July 1, 1904, to be correct—and I see no reason now to question its correctness—it will appear that in the present case the property of the complainant invested in the water system exceeds that which was shown to be invested in the former case by $680,-767.01; that its taxes for the coming year will be in excess of those shown on the former hearing by $180,610; that its operating expenses will exceed the operating expenses of that year by $54,000; and that its income from hydrants will be $48,636 less than its income from the same source under the ordinance of March, 1903. On the face of these figures it is apparent at a glance that the net income of the complainant will be less under the new ordinance than the 4.40 per cent. which the court in the former case adjudged to be less than just compensation for the public use of the complainant's property, and to be such taking of the property of the complainant for public use, in violation of constitutional provisions, as would justify its temporary injunction. These considerations are controlling of the question whether the injunction should or should not issue in the present case, unless the estimate of the complainant's earnings should be largely increased by reason of the increase in the population of the city and county, and the resulting increase in the consumption of water. In the former case the court considered the probable annual increase

in the consumption of water from the increase in the population, and referred to the estimates that were submitted upon the hearing, one placing such increase in income at $80,000, another at $86,786, and still another at $102,000. This latter estimate the court adopted, and added it to the income as estimated by the complainant in arriving at the conclusion before noted, finding the total income under the regulation in force before the ordinance of March, 1903, was adopted to be $2,100,906. In the present case the complainant estimates that its gross annual income under the ordinance of March 7, 1904, would be $1,976,250. No other estimate has been offered, and no evidence has been submitted to discredit that estimate, except that attention was directed to the statement of Mr. Ames, presented to the board of supervisors at the time of its investigation, showing that for 1903 the gross income of the company was $2,075,983.09. But that income, it must be remembered, was derived under the rates established in March, 1902. It is admitted that the ordinance of March, 1904, reduced the rates of 1902 7 per cent., except as to hydrants, which are reduced 50 per cent. If, to the estimate of gross earnings furnished by the complainant, there be added, on account of increase of population, the sum of $100,000 or $200,000, it is still clear that upon the figures submitted the net income derivable from the complainant's property would, under the new ordinance, be less than 4.40 per cent. per annum.

It is urged that since the hearing of the former case the defendants have, at great expense, carefully examined, investigated, and estimated the values of the properties of the complainant, and have demonstrated by the affidavits which they have presented that large portions of such properties are not actually in use in furnishing water to the city and county of San Francisco, and that a state of facts is now shown to the court different from that which was shown on the hearing of the former case. Without attempting to pass finally upon the new evidence or to prejudge its effect when it shall be submitted on the final hearing, when all the matters therein involved shall be fully investigated upon the examination and cross-examination of witnesses, it is sufficient to say that the showing made at the present time is not convincing that the property so specified is not in use and is not necessary to the conservation of the water supply, the protection of its purity, and its delivery to the city, nor does it convince me that the estimate placed by the court upon the value of all the properties in the former case was erroneous or exceeded their actual value. The defendants and the inhabitants of the city can suffer but little injury in this case from the enforcement of a temporary restraining order, since all the consumers of water will be protected by a bond furnished by the complainant. On the other hand, if the injunction were refused and it should be finally determined that the ordinance complained of does in fact establish rates which are confiscatory and violative of the provisions of the Constitution, it is apparent that the complainant would suffer irreparable loss and be subjected to great inconvenience by reason of its inability to collect just rates from a considerable portion of the consumers of the water.

All the questions involved in this litigation ought to be speedily and finally determined. No reason is perceived why all the evidence bear-

ing upon the issues involved may not be presented within the time permitted by the rule of the court, and such will be the order of the court. A preliminary injunction will be allowed as prayed for, restraining the defendants pendente lite or until the further order of the court from enforcing the ordinance of March 7, 1904, and the complainant will be required to give a bond in the sum of $175,000 to answer for all damages which the defendants or any person injured by reason of the injunction may sustain, if, upon the entry of a final decree herein, the said ordinance shall be sustained.