DES MOINES GAS CO. v. CITY OF DES MOINES et al.

(District Court, S. D. Iowa, C. D. August 21, 1912.)

No. 71—M.

1. EQUITY (§ 409*)—REFERENCE—FINDINGS AND CONCLUSIONS OF MASTER.

Where an equity cause is referred generally to a master, his findings and conclusions have every reasonable presumption in their favor, and are not to be set aside or modified, unless there clearly appears to have been error or mistake on his part.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 904, 920–923; Dec. Dig. § 409.*]

2. GAS (§ 14*)—MUNICIPAL REGULATION OF RATES—VALUATION OF PLANT.

In estimating the value of a gas plant, for the purpose of determining the reasonableness of rates established by a city ordinance, the cost of reproduction, while it may be taken into consideration, does not in itself furnish a reliable measure of value, as, for instance, where in computing such cost the experts have included many thousands of dollars for the expense of tearing up and replacing of pavement, a large part of which has been put down since the pipes were laid, and when there is no present need of their renewal, it would be inequitable to capitalize such sum and permit the company to earn dividends thereon.

[Ed. Note.—For other cases, see Gas, Cent. Dig. §§ 10–11; Dec. Dig. § 14.*]

3. GAS (§ 14*)—MUNICIPAL REGULATION OF RATES—VALUATION OF PROPERTY.

The good will of a gas company, by reason of the monopoly given by its franchise, is not an item to be included in estimating the value of its property, for the purpose of determining the reasonableness of rates established by a city ordinance; but the value of the plant as a "going concern" is proper to be considered as an element of the present physical value of the plant.

[Ed. Note.—For other cases, see Gas, Cent. Dig. §§ 10–11; Dec. Dig. § 14.*]

In Equity. Suit by the Des Moines Gas Company against the City of Des Moines and others. On exceptions to master's report. Report confirmed, and decree for defendants.

Geo. H. Carr, W. L. Read, and N. T. Guernsey, for complainant. Robert Brennan, H. W. Byers, and E. C. Carlson, for defendants.

SMITH McPHERSON, District Judge. A gas plant for lighting purposes was established in Des Moines a number of years ago, and now and for several years has been owned by complainant. At one time the rates were $1.30 per thousand, then $1.25, then $1.20, $1.15,

$1.10, and finally $1. The city council, by ordinance of December 27, 1910, fixed the rate at 90 cents. Then this action was brought to enjoin the enforcement of the ordinance, for the reason, as is alleged, that a 90-cent rate will not be remunerative.

The case was referred to Robert E. Sloan as special master, to take the evidence, reduce it to writing, and report the same to the court, together with his findings of fact and conclusions of law. It is most gratifying to the court to learn that counsel on both sides agree that learning, patience, fairness, and all those qualifications a master in chancery should possess are evidenced by nearly one year of work by Judge Sloan in this case. And the report of the master now pending on exceptions fully warrants the correctness of the compliments of counsel as respects the work and report of the master. The court deems it appropriate to make of record the statement that the administration of justice has been furthered by the untiring industry of the master, whose record in this case is in keeping with his longtime service as an Iowa judge.

While counsel on both sides and the court unite on the foregoing, no one means to say that the report of the master is not subject to criticism and exceptions. Neither party is satisfied with all of his findings. But the real test of judicial action is not in the fact that a litigant is not satisfied, nor in the fact that a tribunal in proceedings to review may otherwise conclude.

I deem it appropriate to call attention to another phase of this litigation. The ordinance was adopted within a few minutes from its introduction. Quite likely it had been considered by the members in their individual capacities. But in open session it received but little consideration, and without the presence of any one for the gas company. And every member voting to reduce the earnings had a direct personal and moneyed interest in thus reducing the rates. If a judge were to so act, his acts would be absolutely void, because of the longtime maxim, "No man can be judge in his own cause." And this ought to apply to those who act in an administrative or legislative capacity. This litigation has cost both the gas company and city extravagantly large sums, most of which cannot be taxed as costs, nor recovered back by the party successful in the end. Much of this kind of litigation, and practically all of the expense, would be avoided if Iowa, like so many of the other, including some neighboring, states, had an impartial and city nonresident commission or tribunal, with power to fix these rates at a public hearing, all interested parties present, with the tribunal selecting its own engineers, auditors, and accountants. Too often we have selfish, partisan, prejudiced, and unreliable experts engaged for weeks at a time, at $100 or more and expenses per day, exaggerating their importance, and making the successful party in fact a loser. With all of our boasted advancement, Iowa is a laggard in this matter, and will continue as such until these rate makings are taken from the power of city councils. Appeals to the courts will seldom be taken from the findings of such a tribunal.

But at present the city councils have the duty and power to fix rates; and when rates are thus fixed by them, there is a presumption,

greater or less, according to the character and methods of their work, that such rates are remunerative. And in any event the corporation whose rates are reduced has the burden to show that the rates thus fixed are not remunerative, failing in which the rates must be observed and enforced. And this was the matter referred to the master. He reports that a 90-cent rate is sufficiently high for a sufficient return to the gas company. The order appointing Judge Sloan required him to take all the testimony, including exhibits, return the same to the court, and make findings of fact with his conclusions of law. All these he has done. Both the city and the gas company have filed exceptions to the report.

In many cases courts themselves have heard the rate cases under rule 67 of the General Equity Rules as amended (29 Sup. Ct. xxxiii). But in districts like this, with but a single judge, the time would all be devoted to such cases, with other litigation at a standstill. And the Supreme Court has said that it is a seemly and orderly and commendable course to refer such cases to a master. Railroad v. Tompkins, 176 U. S. 167, 20 Sup. Ct. 336, 44 L. Ed. 417; Lincoln Gas Co. v. Lincoln, 223 U. S. 349, 32 Sup. Ct. 271, 56 L. Ed. 466.

[1] And in case of such a reference the report of the master stands for something substantial, and something besides recommendations. His conclusions have every reasonable presumption in their favor, and are not to be set aside or modified, unless there clearly appears to have been error or mistake on his part. Camden v. Stuart, 144 U. S. 104, 119, 12 Sup. Ct. 585, 36 L. Ed. 363, and cases therein cited. So that it is incumbent on such party to make it clearly appear that the report of the master is erroneous as respects the matters covered by exceptions. The city has filed several exceptions to the report, largely on questions of fact. But they were not argued orally, nor by brief, and the alleged errors are not made clearly to appear. Every of said exceptions of the city is denied.

There are some propositions now so firmly established by the courts as not to be longer within the limits of debate. The net earnings, according to the duration of the franchise, the earning power of money in that vicinity, and the hazards, moral and physical and otherwise, should vary from 4 to 8 per cent., besides that set aside for depreciation and maintenance. But there is and can be no rigid or inflexible rule as to the per cent. to be thus earned. Stanislaus County v. San Joaquin Company, 192 U. S. 201, 216, 24 Sup. Ct. 241, 48 L. Ed. 406; Knoxville v. Knoxville Water Company, 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371; Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034; Railway Commission v. Cumberland Telephone Company, 212 U. S. 414, 29 Sup. Ct. 357, 53 L. Ed. 577; San Diego Sand Company v. National City, 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154; Lincoln Gas Co. v. City of Lincoln, 223 U. S. 349, 32 Sup. Ct. 271, 56 L. Ed. 466; Cedar Rapids Gas Co. v. Cedar Rapids, 223 U. S. 655, 32 Sup. Ct. 389, 56 L. Ed. 594.

The "good will" and that which the corporation enjoys as being the only source from which gas can be obtained is not an element of

value on which profits should be earned in estimating whether the rates are remunerative or confiscatory. Willcox v. Consolidated Gas Co., 212 U. S. 19, 52, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034. All concede that the present value is the basis on which returns are to be estimated. And with the findings of the master on that matter there are but two matters which merit consideration. And on these two questions the great weight of the argument by counsel has been made.

[2] One of these is what is called the "reproduction theory" as determining the present value. When the gas mains were laid, many of the streets were unpaved, but which are now paved streets (21 per cent.). To reproduce the system at this time it would be necessary to take up something like a yard in width and for the length of 21 per cent. of the streets, place the mains the proper depth, fill in with earth, and replace the paving. The extra cost on account of the paving would amount to $140,000. The master declined to allow this sum as forming part of the value of the plant.

It is claimed the true value of any building, structure, or plant is that sum which it takes to reproduce it, less the depreciation of the one to be replaced. But little assistance is obtained from the authorities, although it is claimed the case of Willcox v. Consolidated Gas Company, supra, is in point. The opinion does not show this to be so. Something of a showing is made in favor of that contention, by going to the original record and the assignments of error. But it is not easily understood how the Supreme Court in that great case, so ably argued, with so much involved, meant to be so understood without expressly so declaring in the opinion. No one doubts but that the cost of reproduction may in many cases be considered, and in some cases is a solution of the controversy.

What makes value, and what is the evidence thereof? Metaphysical distinctions as to terms as used with reference to value by political economists aid but little. Exchange value, selling value, cost value, value for use as an utility, value as to incomes, and so on, are too often used loosely. But the question is as to its value today with reference to income. What it may have cost is pertinent. What it will sell for is to be considered. And if destroyed by any agency, such as rust, crystallization, or other forces, what must be paid to reproduce it is a subject of inquiry. All of these may be considered. In my opinion, those who maintain that what it will cost to reproduce the plant, less depreciation, is the true value, in many instances confound the real question with one of many evidences of the real value. Reproducing cost is an evidence of what the real value is after subtracting the depreciation. But what is to be done with the value of stocks and bonds on the reproductive theory? And what becomes of the original cost on the reproduction theory? And what becomes of the question of the increase or falling off in numbers of consumers? And the same as to increased or diminished expenses?

The theory at first thought in all cases is plausible and attractive, but in the end oftentimes utterly illogical and unreliable, originally

adopted as a mere time-saver by mere theorists, and sought to be enforced as against substantial and unbending facts. If the plant is to be reproduced, when is it to be done? If, when reproduced, will the streets then be paved, and, if paved, paved with what? Must it all be reproduced at once, or the same covered by a number of years? If but gradually reproduced, why should not such cost go into either the operating or maintenance accounts? No one can state when it must be reproduced, and a material question arises: What, then, as compared with the present, will be the price of labor, material, and freight? But finally and to my mind the conclusive reason against the soundness of the reproduction under paved streets is that to allow that theory to prevail, and to increase the capitalization now to the extent of $140,000, is to allow such gas rates as will pay a dividend on such sum from and after this date. But the sum of $140,000 is not put in the capital or value account until the plant is reproduced. As of course, streets paved or unpaved make no difference in the earning power of the gas plant, and but little, if anything, goes more directly and accurately to the question of value of any structure or plant than its rental, earnings, or as a dividend producer.

There are many instances in which the reproduction theory is the best of all methods for getting at the present value, and in other instances the most misleading. And it is deceptive, in my opinion, to now add the cost of taking up and replacing pipe under paved streets at an estimated cost of $140,000 extra, and does not warrant an increased dividend of $8,400 or some greater sum. Such a dividend is a mere paper dividend, and is arrived at, not because of increased earnings; not because of increased capital or investments, not because of increased operating or maintenance expenses, but solely by reason of a supposed necessity of at some time, in some manner, under a then some kind of street, on a mere guess of what labor and material would then cost. Many of the principles with relation to railway rates are applicable to gas rates. And perhaps the latest analysis of the reproduction theory is found in the recent case of Louisville R. R. v. Railway Commission (D. C.) 196 Fed. 800, in an opinion of Judge Jones of the Alabama district. He shows the value of this theory, but likewise shows that it is not a hard and fast rule covering all phases. Finally, pipes under a paved street are of very long life, many times longer than if the streets were not paved. The theory applied to paved streets is but a theory, is illogical and against facts, and was properly denied by the master.

[3] The master finds that the "going concern" value of the plant is $300,000; but the gas company, by its exceptions, contends that this sum is not in the total of items making $2,240,928, the value placed on the entire plant. A "good will" value and a "going concern" value are often confused and used interchangeably, and I am inclined to believe that in some instances the master's report is subject to this criticism. But whether this is so or not is not of much importance; and it is more of a verbal criticism than a practical one. Under the authorities cited, as well as others easily found from

those cited, a "good will" value, by reason of being a monopoly, such as a gas company has under an ordinance, is not to be reckoned. The item of $300,000 for "going value" is quite important in this case. It is contended that if this $300,000 must be added, and the consumption of gas remains the same, and the percentage of dividends allowed by the master should stand, there will then be a shortage. The authorities already cited, and which in my opinion are in accord with good sense, favor the allowance of a "going value." Every kind of business, with no exception, has a value known as "going value," and such "going value" is in no way connected with the monopoly or "good will" value. The gas company contends that this "going value" of $300,000 was erroneously omitted by the master in his totals, while the city contends that the sum of $300,000 has already been considered in making up the grand total of $2,240,928. I am of the opinion that the contention of the city is a correct one. This matter has received from me most earnest attention and consideration, and I will briefly present the reasons for my conclusion.

The master fixes the physical value at $2,240,928. He means thereby, and to my mind clearly states that as, the value of the *gas plant.* There are but five items making this grand total. Counsel on both sides and I agree that "going value" is a part of the present value. The master so held. It would be strange that the master would hold that the "going value" of $300,000 entered into the actual value, and then by inadvertence omit it. And it would be the more strange after considering the items set forth in the report. By the report he lists the following:

1. Working capital........................................ $ 140,000 00
2. Real estate............................................ 150,000 00
3. Organization expenses.................................. 6,923 00
4. Meters in stock....................................... 6,603 00
5. Present value of physical property. aside from above items.. 1,937,402 00

Evidently, because the master used the word *physical,* counsel seem to conclude that he did not include "going value." If he had omitted the word "physical" as an identification, then no one would doubt but that he did include "going value." But why would the master include five items, and omit one that he meant to include? But the criticism is too refined and technical to stand as against his entire report. After enumerating the four items, he adds, "Present value of physical property *aside from* above items, $1,937,402.-00." This is as though he had said, "All other items of value to be considered." How can it be said that he meant "junk value"? Or "bare-bones" value, as used in some of the cases? It is not fair to say that he meant junk value, or bare-bones value. He meant that was the value coupled with the preceding items of the gas plant —a plant making and selling gas. He meant that, and neither more nor less than that.

If the question were now for decision, I would have much doubt as to the item of working capital, $140,000. The master was liberal with the gas company by allowing that item. I fail to find sat-

isfactory evidence in this tremendous record as to that item, although there is evidence bearing thereon. But every business man knows that the gas company daily makes deposits, and daily checks out for expenses, and at stated periods for interest on its bonds and for dividends. Whether it receives interest on its daily balances does not appear, nor does it appear whether it must pay interest on its overdrafts, if it has such. And if it has on hand $140,000 as working capital, why such sum would not earn interest is not made to appear. I only mention this to show that the master has not borne down on the gas company.

When the restraining order was issued herein, to be in force pending litigation, it was done with full consideration. An actual test is the highest degree of proof as to some phases, and some phases only, of litigation like this. But it was made to appear that a very large number of gas consumers paid cash without waiting for the presentation of bills. This was made easy to do by the meters having annexed thereto a mechanism so adjusted that by dropping any sum of metal money through a slot, the requisite amount of gas could be used on the basis of $1 per thousand. And the mechanism would correctly measure the gas on that basis. As of course, to allow the consumer to have 1,000 feet of gas at 90 cents, the wheels and appliances must be changed. To do this persons familiar with such mechanism must be employed. And it was made to appear that it would take more than a month of time to do this, and at much expense.

Every one of the exceptions of the gas company is overruled. The bill of complaint is dismissed, with prejudice, and the interlocutory writ of injunction and restraining order vacated. But the vacation of such writs will not be effective for 60 days from the decrees this day entered, to the end that such mechanisms may be adjusted to the 90-cent rate. And to the further end that if said decree by actual test may prove that a 90-cent rate is not remunerative, the decree, will provide that, after three years of such actual test, this case may be reinstated, and the pleadings and evidence now on file, used as of full probative force supplemented by such additional pleadings and evidence as may be deemed by either party advisable. This will so materially reduce the expense as to make it almost nominal. In the event of an appeal, a supersedeas bond in the penalty of $5,000 will be approved. But such a bond will only supersede the payment of the costs. Any other supersedeas must be applied for to the appellate court.

Such will be the decree.