## PACIFIC GAS & ELECTRIC CO. v. CITY AND COUNTY OF SAN FRANCISCO et al.

(District Court, N. D. California, S. D.   June 3, 1921.)

### Nos. 27, 97, 190.

1. **Gas ⬅⟶14(1)—Cutting and replacing paving over mains not part of cost of reproduction of plant.**

   In valuing the property of a gas company for rate purposes, the cost of cutting and replacing pavement over mains *held* properly excluded in estimating the cost of reproduction.

2. **Gas ⬅⟶14(1)—Franchise not included in property valued for rate purposes.**

   The franchise of a gas company to use the streets of a city, which was not exclusive, and for which nothing was paid, and where the company was subject to municipal regulation of its rates, *held* properly excluded in the valuation of its property in a rate suit.

3. **Gas ⬅⟶14(1)—Going concern value allowed in valuation of property of gas company.**

   In the valuation of the property of a gas company for rate purposes, the addition of 12 per cent. to the value of the physical property for going concern value approved.

4. **Gas ⬅⟶14(1)—Value of patent rights not allowable in valuation of property of company.**

   Patent rights owned by a gas company, by the use of which cost of manufacture is lessened, not included in property valued for rate purposes.

5. **Gas ⬅⟶14(1)—Reserve allowed company to cover insurance risk held reasonable.**

   In determining reasonableness of rates of a gas company, which carried no insurance, an allowance of a reserve to cover fire risk of a sum largely in excess of its losses through a series of years *held* reasonable.

6. **Gas ⬅⟶14(1)—Company not entitled to allowance for efficient management in fixing reasonable rates.**

   In determining reasonable rates which a gas company is entitled to earn, it is not entitled to an annual allowance for efficient management.

7. **Gas ⬅⟶14(1)—Rates not invalid because nonremunerative in case of small consumers.**

   That gas rates fixed by municipal ordinance require a company to supply small consumers at a loss does not render them invalid, if as a whole they produce a fair return.

8. **Gas ⬅⟶14(2)—Rates fixed by municipality set aside by courts only when clearly confiscatory.**

   In determining what are fair and reasonable rates to be charged by a gas company, a city council exercises a discretionary power, and since there are necessarily many elements of uncertainty in the valuation of property and in respect to other items to be taken into consideration, a court is authorized to substitute its judgment and declare such rates invalid only when they are clearly confiscatory, taking into consideration the fact that what is a fair rate of return on the investment differs with time and locality.

Suit in Equity by the Pacific Gas & Electric Company against the City and County of San Francisco and others. On exceptions by complainant to report of master. Exceptions overruled, and decree for defendants.

⬅⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

W. B. Bosley, of San Francisco, Cal., for plaintiff.

George Lull, Robert M. Searls, and John J. Dailey, all of San Francisco, Cal., for defendants.

RUDKIN, District Judge. The plaintiff is a corporation engaged in the business of manufacturing and supplying gas to consumers in the city and county of San Francisco. Pursuant to the requirements of the state Constitution the board of supervisors of the city and county, in the month of June, 1913, adopted an ordinance fixing rates to be charged for gas furnished to consumers for lighting and heating purposes during the year commencing July 1, 1913, and ending June 30, 1914. The ordinance fixed a maximum rate of 75 cents per thousand cubic feet of gas, but prescribed no minimum. Soon after the ordinance took effect, the gas company commenced a suit in this court to restrain the municipal authorities from enforcing the ordinance, on the ground that it violated the due process clause of the Fourteenth Amendment to the Constitution of the United States, which declares that no state shall deprive any person of life, liberty, or property without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. Similar ordinances were adopted in the two succeeding years, and their adoption was followed by similar suits. By consent of parties the three suits were consolidated for trial and referred to a special master to take testimony and report to the court. The cases are now before the court on exceptions to the master's report. The exceptions were argued at length before me on the last day of May and the 1st day of June of last year, but months elapsed before the filing of briefs and final submission. Since then I have carefully examined the master's report, the briefs submitted, the voluminous testimony offered at the trial, and the arguments of counsel, and am now prepared to announce my conclusions. But inasmuch as a final decision has already been too long delayed I must content myself with a reference to, and brief discussion of, the more important questions presented by the exceptions.

Generally speaking, the properties of the plaintiff used and useful, and reasonably necessary to the manufacture and distribution of gas may be described as follows: Lands; manufacturing and distributing plants, consisting of structures, machinery, apparatus, equipment, and appliances; working capital; patent rights; going concern or established value; and the franchise of using the public streets of the city as a right of way for laying, maintaining, and operating gas mains and service pipes with the necessary connections for supplying the city and county of San Francisco and its inhabitants with gas. The master found that the reasonable value of these properties and rights for the year 1913–1914, including working capital, was the sum of $13,976,435; that the reasonable cost of operation was $2,031,926.11; that $348,853 was a reasonable allowance for depreciation, $10,000 as a reserve for fire insurance, and $15,000 for casualty insurance; and that $978,350.45, or 7 per cent., was a reasonable return on the capital invested, making a total of $3,384,129.56. The total revenue at the ordinance

rate was $3,405,532.51, or $21,402.95 in excess of the 7 per cent. return on the capital invested. A slightly increased value was found for 1914–1915 and 1915–1916, and the net return for these respective years at the ordinance rates was $89,446.12 and $171,464.48 in excess of the 7 per cent. return which the master found to be the lowest rate or return that would not result in confiscation. The master concluded, therefore, that the ordinance rates were not confiscatory, and recommended that the several bills be dismissed and that proper decrees be entered to carry out the previous orders of the court. Many items go to make up the values thus returned, and the allowances for operating expenses and depreciation, and many of these items have been excepted to by the respective parties. But any attempt to review each separate exception would extend the opinion to an inordinate length and to little purpose, especially in view of the fact that the allowance or disallowance of many of the smaller items would have no effect upon the final result. For this reason I will confine myself to the more important items in controversy.

[1] *Paving Over Mains.*—The plaintiff contends that reproduction of the plant would necessitate the cutting and replacing of the pavement laid over the mains by the city, and the cost of this is estimated at approximately $600,000. The master disallowed the item, and this ruling is the basis of one of the exceptions. In answer to a similar claim in Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 171, 35 Sup. Ct. 811, 817 (59 L. Ed. 1244), the court said:

"As to the item of $140,000, which, it is contended, should be added to the valuation, because of the fact that the master valued the property on the basis of the cost of reproduction new, less depreciation, and it would be necessary in such reproduction to take up and replace pavements on streets which were unpaved when the gas mains were laid, in order to replace the mains, we are of opinion that the court below correctly disposed of this question. These pavements were already in place. It may be conceded that they would require removal at the time when it became necessary to reproduce the plant in this respect. The master reached the conclusion that the life of the mains would not be enhanced by the necessity of removing the pavements, and that the company had no right of property in the pavements thus dealt with, and that there was neither justice nor equity in requiring the people who had been at the expense of paving the streets to pay an additional sum for gas because the plant, when put in, would have to be at the expense of taking up and replacing the pavements in building the same. He held that such added value was wholly theoretical, when no benefit was derived therefrom. We find no error in this disposition of the question."

So here I find neither justice nor equity in the present claim, and the same is accordingly disallowed.

[2] *Franchises.*—The plaintiff further contends that there should be added to the value fixed by the master the sum of $1,476,000 for the franchise of using the public streets of the city as a right of way, for laying, maintaining, and operating the gas mains and service pipes. This item is based on the cost of procuring a private right of way through the city for the like purposes, less the difference between the cost of constructing the system over such private right of way and the cost of constructing the same in the city streets. The item was disallowed by the master, and his ruling forms the basis of another excep-

tion to the report. That a franchise of this kind is property, and has value for some purposes, does not admit of question; but such value depends entirely upon circumstances. If, as in the case of Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034, the company has a practical monopoly is not subject to public regulation and is permitted to pay enormous dividends on the invested capital, the franchise or franchises are naturally and necessarily of very considerable value. But, on the other hand, where the rates are subject to public regulation and only fair and reasonable rates are permissible, a different situation is presented, and whether in such case the franchise has value or not depends largely upon the views of the rate-making body and the decisions of the courts. If the court should here find that the franchise in question has a value of approximately $1,500,000, as claimed, and that the plaintiff is entitled to a reasonable return on that value, the value of the franchise is thus fixed as firmly as the value of any of the tangible property of the company. But why should the court make such addition or allowance? Nothing was paid for the franchise in the first instance; it is not exclusive, has no peculiar value, and when the plaintiff is allowed a fair return on the full value of its tangible property, including going concern value, it has no just ground for complaint.

Such, it seems to me, was the view of the Supreme Court in the Willcox Case. There the value of the franchises had been fixed upon consolidation in 1884 under legislative authority. The court below found the value of the franchises in 1884 as thus fixed, and further found that their value increased thereafter in the same ratio as the value of the other tangible property of the company. The Supreme Court approved the valuation as fixed in 1884 under legislative authority, because that valuation had been fixed by authority of law, the agreement regarding it had always been recognized as valid, and the stock had been largely dealt in for more than 20 years past on the basis of the validity of the valuation of the stock issued by the company. But the court refused to allow any increase in that valuation, concluding that branch of the case by saying:

"What has been said herein regarding the value of the franchises in this case has been necessarily founded upon its own peculiar facts, and the decision thereon can form no precedent in regard to the valuation of franchises generally, where the facts are not similar to those in the case before us. We simply accept the sum named as the value under the circumstances stated."

The inference from this language is that under normal conditions, such as here presented, no franchise value should be taken into consideration or allowed.

[3] *Going Concern Value.*—In fixing the value of the property and plant, the master added for this element the sum of $1,500,000 to the value of the physical property. To this finding both parties have excepted. Little can be gained from a discussion of a subject so intangible and speculative as this. The question has been referred to or discussed by the courts in the following, among the many cases that

might be cited: National Waterworks Co. v. Kansas City, 62 Fed. 853, 864, 10 C. C. A. 653, 27 L. R. A. 827; Knoxville v. Water Co., 212 U. S. 1, 9, 29 Sup. Ct. 148, 53 L. Ed. 371; Des Moines Gas Co. v. Des Moines (D. C.) 199 Fed. 204, Id., 238 U. S. 153, 162, 35 Sup. Ct. 811, 59 L. Ed. 1244; Denver v. Denver Union Water Co., 246 U. S. 178, 38 Sup. Ct. 278, 62 L. Ed. 649; Lincoln Gas. Co. v. Lincoln, 250 U. S. 256, 267, 39 Sup. Ct. 454, 63 L. Ed. 968; Spring Valley Water Co. v. City & County of San Francisco (D. C.) 252 Fed. 979. In the Knoxville Case the court refused to approve or disapprove an allowance of approximately 10 per cent. of the value of the physical property. In the Des Moines Case no separate allowance for going concern value was made, but both courts concluded that the element was taken into consideration and sufficiently provided for in the general findings of the master. In the Denver and Spring Valley Water Company Cases the allowance was considerably less than here. In this case the master added approximately 12 per cent. to the value of the physical property to cover this element, and under the circumstances disclosed by the record I think the allowance thus made was fair and just, if not liberal. The exception on the part of the plaintiff is therefore overruled.

[4] *Patent Rights.*—The plaintiff acquired from its chief engineer and his assistant the exclusive right to use certain patented devices and processes in the city and county of San Francisco and other counties of Northern California, by the use of which the cost of manufacturing gas was materially lessened, and it claims an allowance of $4,000,000 because of these acquisitions. A disallowance of the claim is the subject of another exception. The gas consumers of San Francisco have no concern with the exclusive rights thus acquired, even in the city and county, much less in other counties of the state. They are only chargeable with the reasonable cost or value of the right to use the devices and processes in the manufacture of gas in the city and county of San Francisco. In the Spring Valley Case, supra, the water company for many years pumped water for its system from the gravel underlying a considerable acreage of agricultural land. These pumping operations lowered the water table to such an extent that the company was threatened with litigation, and to avoid injunction suits and actions at law for damages it purchased the lands outright, and the value of these lands was added to the value of its other property for the purpose of ascertaining the rating base by the master. In discussing this question the court said:

"However desirable the acquisition of these lands may have been from a business standpoint, the fact remains that they are not necessary to the maintenance of the system, and not used or useful in connection therewith. It seems to me that the correct basis would be to ascertain as nearly as possible the value of the right or interest in these lands which is actually used for public purposes, and base the rate of return on that valuation."

So here the rate of return should be based on the reasonable cost or value of the rights acquired for the purpose of manufacturing gas in the city of San Francisco and not elsewhere. The record affords no basis for such a finding, and under these circumstances the claim as made was properly rejected.

[5] *Insurance.*—In each of the years in controversy the master allowed as a reserve for fire insurance $10,000 and for casualty insurance $15,000. The plaintiff claimed a much larger allowance, and to the refusal of the master to make the same an exception has been taken. The claim of the plaintiff to the additional allowance is based on the cost of procuring or obtaining insurance from the standard companies. I see no basis for this claim. As stated by the master, a little less than half of the premiums received by insurance companies in general go to pay the expense of obtaining insurance, and why should the plaintiff, who took out no insurance, be entitled to these profits. It is unquestionably entitled to set aside a reasonable reserve to cover losses of this kind, but the record fails to show that such a reserve was not allowed. The allowance of the master greatly exceeded the average losses of the company during the eight preceding years; and this is persuasive at least that the allowance as made was fair and reasonable to the plaintiff. The exception is overruled.

[6] *Compensation for Management.*—The plaintiff claims a considerable allowance for efficient management of the affairs of the company during each year. I assume the company was managed through its officers and agents and that they have been paid just compensation for their services. If they have not, that fact affords no sufficient reason for making a donation to stockholders at this time. This, as well as other claims, were doubtless taken into consideration by the master in fixing the rating base and a reasonable return on the invested capital.

Much has been said in the course of the argument and in' the briefs concerning original cost, book value, and reserves for depreciation resulting from different causes, but I will not attempt to review the testimony bearing upon these questions. Suffice it to say that the findings of the master are amply supported by the testimony, and beyond this I am not required or permitted to go.

[7] Another contention is that the ordinances compel the plaintiff to furnish gas to small consumers at less than cost and that such a requirement is violative of its constitutional rights. This question has been fully answered by the Supreme court. Thus in the Willcox Case the court said:

"So long as the total is enough to furnish such return, it is not important that with relation to some customers the price is not enough."

In support of this ruling the court cited Minneapolis, etc., Co. v. Minnesota ex rel. Railroad & W. Commission, 186 U. S. 257, 22 Sup. Ct. 900, 46 L. Ed. 1151, and Atlantic Coast Line v. North Carolina Commission, 206 U. S. 1, 27 Sup. Ct. 585, 51 L. Ed. 933, 11 Ann. Cas. 398. It is a noteworthy fact that, when the plaintiff was left free to act, it established a maximum rate of only 85 cents, or less than the actual cost to small consumers. It is urged that the plaintiff was at liberty to give its property away if it chose, but it is not an eleemosynary corporation, and in fixing rates was no doubt prompted by business considerations, and not by charity.

[8] The concluding finding of the master is that 7 per cent. is a reasonable return on the capital invested, and that any less rate of return would be confiscatory. To this finding both parties have excepted. I can add but little to what was said upon this subject in the Spring Valley Case, supra, nor do I feel called upon to modify my views or answer the criticisms of the master. But a word on this subject may not be out of place. It is said in the report that when the court conceded that 7 per cent. was a fair rate of return the case was ended, and that the court was controlled too largely by precedent. In other words, his view is that, when the court found the value of the property and the fair rate of return, it thereby established a procrustean standard to which all else must yield. Applying that rule to these cases, had the returns fallen short each year by the sum of $25,000, the ordinance for the first year would be void, and the remaining two ordinances valid, notwithstanding the fact that all three ordinances were enacted under identical circumstances and prescribed the same maximum rate.

Such a conclusion is, to my mind, absurd and ridiculous. The reason for this is obvious. The subject-matter with which the board of supervisors had to deal was full of doubt and intricacy at best. The valuation of the property was a mere matter of approximation and the operating expenses and income were unknown. The last two elements might be made certain by future developments but the uncertainty as to value would still remain. The valuation of a plant of this kind is largely a matter of guess work. Unlike cotton, wheat, and other commodities, that are bought and sold daily on the market and have an established value, gas plants are seldom sold, and if one should be sold the selling price offers a poor criterion by which to fix the value of another where the surrounding circumstances may be entirely different. Noted engineers will differ, and differ widely, as to the value of such plants. The difference between the engineers who come before this court so highly commended by the master and by counsel is measured by millions and not by thousands. No two courts and no two juries would reach the same conclusion upon the same testimony. A difference of 10 per cent. in the appraisement or valuation would be accepted as a matter of course rather than as a matter of surprise. The courts have no monopoly on the privilege of appraising or guessing. They must accord the same rights and the same privileges to the board of supervisors, and the mere fact that they may differ from the board in their conclusions does not necessarily establish the charge of confiscating private property or denying to the citizen the equal protection of the laws. In other words, the court must not only differ with the board, but it must differ so widely that it is able to say in the language of the Supreme Court:

"In a case like this we do not feel bound to reexamine and weigh all the evidence, although we have done so, or to proceed according to our independent opinion as to what were proper rates. *It is enough if we cannot say that it was impossible for a fair-minded board to come to the result which was reached.*" (Italics supplied). San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 441, 23 Sup. Ct. 571, 47 L. Ed. 892, Approved in Knoxville v. Water Co., 212 U. S. 1, 17, 29 Sup. Ct. 148, 53 L. Ed. 371.

Does, therefore, the mere finding of the court establish the fact that no fair-minded board in the exercise of an honest judgment could reach a different conclusion? To some it may, but, speaking for myself alone, I can only say that I assume no such arrogance and make no such claim to superiority, omniscience, or infallibility.

These views find ample support in the authorities. Thus, in Spring Valley Waterworks v. San Francisco (C. C.) 124 Fed. 574, 598, Judge Morrow found from the weight of the expert evidence before him that 6 per cent. per annum was the smallest income that could be considered reasonable on the investment under consideration, and that 5 per cent. was the smallest income which the court could, under all the circumstances of the inquiry, consider reasonable and just. This case was followed by Judge Gilbert in Contra Costa Water Co. v. City of Oakland (C. C.) 165 Fed. 518, 532, and Spring Valley Water Co. v. San Francisco (C. C.) 165 Fed. 657, 665, and by Judge Farrington in Spring Valley Waterworks v. San Francisco (C. C.) 192 Fed. 137, 192. In the Knoxville Case the Supreme Court said:

"It cannot be doubted that in a clear case of confiscation it is the right and duty of the court to annul the law. Thus in Reagan v. Farmers' Loan & Trust Company, 154 U. S. 362, where the property was worth more than its capitalization, and upon the admitted facts the rates prescribed would not pay one-half the interest on the bonded debt; in Covington, etc., Turnpike Co. v. Sandford, 164 U. S. 578, where the rates prescribed would not even pay operating expenses; in Smyth v. Ames, 169 U. S. 466, where the rates prescribed left substantially nothing over operating expenses and cost of service; and in Ex parte Young, supra, where, on the aspect of the case which was before the court, it was not disputed that the rates prescribed were in fact confiscatory—injunctions were severally sustained. But the case before us is not a case of this kind. Upon any aspect of the evidence the company is certain to obtain a substantial net revenue under the operation of the ordinance. The net income, in any event, would be substantially 6 per cent., or 4 per cent. after an allowance of 2 per cent. for depreciation. See Stanislaus County v. San Joaquin Company, 192 U. S. 201. We cannot know clearly that the revenue would not much exceed that return. We do not feel called upon to determine whether a demonstrated reduction of income to that point would or would not amount to confiscation."

In the Des Moines Case, supra, the court held that there was no error in refusing an injunction upon the conclusion reached that a return of 6 per cent. per annum on the valuation would not be confiscatory in the face of the report of the master that the company ought to earn 8 per cent. In the Willcox Case, and in the case of Cedar Rapids Gaslight Co. v. Cedar Rapids, 223 U. S. 655, 32 Sup. Ct. 389, 56 L. Ed. 594, a finding of 6 per cent. was approved. In the Denver Case the court held that a return of 4.2812 per cent. of the value of the plant was confiscatory, but found it unnecessary to determine whether a considerable sum claimed for water rights should be added to the value. Should the value of the water rights be included, the return would be further reduced. So far as I am advised this is the highest rate of return that the Supreme Court has ever declared to be confiscatory. True, in the more recent case of Lincoln Gas Co. v. Lincoln, supra, the court disapproved a finding that 6 per cent. upon the invested capital could not be regarded as confiscatory, in view of the

undisputed evidence accepted by the master that 8 per cent. was the lowest rate sought and generally obtained as a return upon capital invested in banking, merchandising, and other business in the vicinity; 7 per cent. being the legal rate of interest in Nebraska. The bill of complaint, however, in that case, was dismissed, so that the question as to what constitutes a confiscatory rate was not determined by the court.

If it be claimed that the court there held that any discrepancy between the finding of the court and the established rate which is prejudicial to the public utility is confiscatory, it will be difficult indeed to reconcile the decision with many prior decisions of the same court. Under such a view the courts will in effect review the decisions of rate-making bodies, notwithstanding their repeated disclaimer of their right and authority so to do. Furthermore, if any such hard and fast rule is adopted, Public Service Commissions cannot safely establish what they themselves deem fair and reasonable rates. They must, in addition, allow a considerable margin of safety to cover possible deficiencies in revenue, increases in operating expenses, and differences of opinion as to values. If they do not, the courts will be constantly appealed to, and the benefits of regulation will be more than offset by the burdens of litigation. The very fact that in the years in question here the rate of return differed more than 1 per cent. on the total value of the property under substantially identical conditions all but demonstrates the utter fallacy and futility of such a course. I have not overlooked the fact that in many, if not all, the foregoing cases the returns in controversy had not been tested by time, so that the exact rate of return was ascertainable, and this fact was in a measure controlling; but, for reasons already stated, this is not the only element of uncertainty with which courts and rate-making bodies are confronted in this class of suits.

It may be true that the court did not consider the customary rate of interest on local investments as absolutely controlling, for, as said in the opinion:

"But it is a matter of common knowledge that interest rates vary almost as much in the same locality at different times as they do in different localities at the same time, and in an enterprise of this magnitude the question of locality, while entitled to consideration, is not controlling."

In the Willcox Case the court said:

"Such compensation must depend greatly upon circumstances and locality; among other things, the amount of risk in the business is a most important factor, as well as the locality where the business is conducted and the rate expected and usually realized there upon investments of a somewhat similar nature with regard to the risk attending them."

As there stated, the risk of the business is the most important factor. Capital has no home, and always seeks employment where it can gain the best returns with the least risk. In Stanislaus County v. San Joaquin K. & I. Co., 192 U. S. 201, 24 Sup. Ct. 241, 48 L. Ed. 406, the court declared that a statute reducing the compensation for supplying water to 6 per cent. upon the present value of the property used for the purpose was not unconstitutional, and that there was nothing in

the nature of confiscation about it. The court made no reference.to local conditions. Its language was as broad as the domain over which its jurisdiction extends, was as applicable to Maine as to California, and was evidently so intended. In the recent case of Simpson v. United States, 252 U. S. 547, 40 Sup. Ct. 367, 64 L. Ed. 709, the court said that it would take judicial notice of the fact that 4 per cent. was very generally assumed to be the fair value or earning power of money safely invested, and it is but a very short step to take judicial notice of the earning power of money invested in a public utility of this magnitude, when subject to public regulation. In many of the cases to which I have referred, little or no reference was made to local interest rates or to local conditions, and for these reasons I feel that my conclusions were fully justified, on both principle and authority.

Without further comment, I will only add that in no aspect of the record can the court say that the plaintiff has been deprived of or denied the full protection of the Constitution. The exceptions to the report of the master are therefore overruled, and a decree will be entered in accordance therewith.

### Supplemental Memorandum.

Counsel seem unable to agree upon the disposition to be made of the exceptions reserved by the defendants, in view of the statement in the opinion that the exceptions to the report are overruled. As soon as the court reached the conclusion that the exceptions on the part of the plaintiff were not well taken, it became unnecessary to discuss or consider the exceptions reserved by the prevailing party, and for that reason no reference to such exceptions was made, unless an exception to the same ruling was reserved by both parties. In the latter event the court considered the question from the standpoint of the plaintiff only, and deemed it unnecessary to consider or view the report in any other aspect.

As was originally intended, the exceptions on the part of the plaintiff are therefore overruled, the report of the master is confirmed, and the final decree will so declare.